# EXHIBIT A

# COMMERCE PROGRAM ADDENDUM
# TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

**X**   1.   Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

_____   2.   Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

_____      a.   Uniform Commercial Code transactions;

_____      b.   Purchases or sales of business or the assets of businesses;

_____      c.   Sales of goods or services by or to business enterprises;

_____      d.   Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

_____      e.   Surety bonds;

_____      f.   Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

_____      g.   Franchisor/franchisee relationships.

_____   3.   Actions relating to trade secret or non-compete agreements;

_____   4.   "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

_____   5.   Actions relating to intellectual property disputes;

_____   6.   Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

**X**   7.   Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

_____   8.   Actions relating to corporate trust affairs;

_____   9.   Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

_____   10.   Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**MARCH 2017**

E-Filing Number: 1703061429

**002824**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| DAVID HEED | ALAN B.. MILLER |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 240 TOWNSEND SQUARE OYSTER BAY NY 11771 | 367 SOUTH GULPH ROAD KING OF PRUSSIA PA 19406 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | MARC D.. MILLER |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 367 SOUTH GULPH ROAD KING OF PRUSSIA PA 19046 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | STEVE G.. FILTON |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 367 SOUTH GULPH ROAD KING OF PRUSSIA PA 19046 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | | |
|---|---|---|---|---|
| 1 | 9 | ☒ Complaint ☐ Writ of Summons | ☐ Petition Action ☐ Transfer From Other Jurisdictions | ☐ Notice of Appeal |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less ☒ More than $50,000.00 | ☐ Arbitration ☐ Jury ☐ Non-Jury ☐ Other: | ☐ Mass Tort ☐ Savings Action ☐ Petition | ☒ Commerce ☐ Minor Court Appeal ☐ Statutory Appeals | ☐ Settlement ☐ Minors ☐ W/D/Survival |

CASE TYPE AND CODE

1S - STOCKHOLDERS' SUITS

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

**FILED
PRO PROTHY**

MAR **24** 2017

**M. BRYANT**

IS CASE SUBJECT TO COORDINATION ORDER?

YES          NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>DAVID HEED</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| JACOB A. GOLDBERG | 101 GREENWOOD AVENUE SUITE 440 JENKINTOWN JENKINTOWN PA 19046 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)600-2817 | (212)202-3827 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 66399 | jgoldberg@rosenlegal.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *JACOB GOLDBERG* | Friday, March 24, 2017, 05:40 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

```
1. ALAN B.. MILLER
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19406
2. MARC D.. MILLER
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
3. STEVE G.. FILTON
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
4. ANTHONY PANTALEONI
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
5. EILEEN C.. MCDONNELL
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
6. ROBERT H.. HOTZ
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
7. JOHN H.. HERRELL
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
8. LAWRENCE S.. GIBBS
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
9. UNIVERSAL HEALTH SERVICES, INC.
     367 SOUTH GULPH ROAD
     KING OF PRUSSIA PA 19046
```

IN THE COURT OF COMMON PLEAS OF
PHILADELPHIA COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| DAVID HEED, Derivatively and on Behalf of UNIVERSAL HEALTH SERVICES, INC., | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | PLAINTIFF'S VERIFIED SHAREHOLDER |
| ALAN B. MILLER, MARC D. MILLER, STEVE G. FILTON, ANTHONY PANTALEONI, EILEEN C. MCDONNELL, ROBERT H. HOTZ, JOHN H. HERRELL, and LAWRENCE S. GIBBS, | ) ) ) ) ) ) | DERIVATIVE COMPLAINT Filed on Behalf of Plaintiff |
| Defendants, | ) ) | |
| and | ) ) | |
| UNIVERSAL HEALTH SERVICES, INC., | ) ) | |
| Nominal Defendant. | ) ) | |

**NOTICE TO DEFEND**

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. I/you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

Philadelphia Bar Association
Lawyer Referral
and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

AVISO

Le ban demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Dace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero sujiciente de pagar tal servicio. Vaya en persona o llame por telefono a la ojicina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal*

Asociacion De Licenciados
De Filadelfia
Servicio De Referencia E
Informacion Legal
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

IN THE COURT OF COMMON PLEAS OF
PHILADELPHIA COUNTY, PENNSYLVANIA

Filed and Attested by the
Office of Judicial Records
24 MAR 2017 05:40 pm
M. BRYANT

| | | |
|---|---|---|
| DAVID HEED, Derivatively and on Behalf of UNIVERSAL HEALTH SERVICES, INC., | ) ) ) ) | CIVIL DIVISION |
| | | Case No. _____ |
| Plaintiff, | ) ) | Code: ___ |
| v. | ) ) | TYPE OF PLEADING: |
| ALAN B. MILLER, MARC D. MILLER, STEVE G. FILTON, ANTHONY PANTALEONI, EILEEN C. MCDONNELL, ROBERT H. HOTZ, JOHN H. HERRELL, and LAWRENCE S. GIBBS, | ) ) ) ) ) ) ) ) | PLAINTIFF'S VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT Filed on Behalf of Plaintiff |
| Defendants, | ) ) | Counsel of Record for These Parties: |
| and | ) ) | Jacob A. Goldberg (PA ID: 66399) |
| UNIVERSAL HEALTH SERVICES, INC., | ) ) | |
| Nominal Defendant. | | |

## THE PARTIES

The Plaintiff Davud Heed is an adult individual, who has a current address c/o 240 Townsend Square, Oyster Bay, NY 11771.

The Defendants Alan B. Miller, Marc D. Miller, Steve G. Filton, Anthony Pantaleoni, Eileen C. McDonnell, Robert H. Hotz, John H. Herrell, and Lawrence S. Gibbs are adult individuals with a current address c/o 367 South Gulph Road, King of Prussia, Pennsylvania 19406.

The Nominal Defendant Universal Health Services, Inc. is a Delaware corporation with its

- 1 -

principal executive offices at 367 South Gulph Road, King of Prussia, Pennsylvania 19406.

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff David Heed ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Universal Health Services, Inc. ("UHS" or the "Company"), files this Shareholder Derivative Complaint against Individual Defendants Alan B. Miller, Marc D. Miller, Steve G. Filton, Anthony Pantaleoni, Eileen C. McDonnell, Robert H. Hotz, John H. Herrell, and Lawrence S. Gibbs (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of UHS, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for his Complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding UHS, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy the wrongdoing certain of UHS's directors and officers committed starting on August 7, 2015 and through the present (the "Relevant Period").

Case ID: 170302824

2.      UHS owns and operates, through its subsidiaries, acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers, and radiation oncology centers.  As of February 25, 2016, UHS owned and/or operated 24 inpatient acute care hospitals, 3 free-standing emergency departments and 213 inpatient and 16 outpatient behavioral health care facilities located in 37 states, Washington, D.C., Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

3.      Beginning on August 7, 2015, the investing public was under a false impression of, *inter alia*, the admission and retention practices adopted by the Company's behavioral health care facilities, the staffing level maintained, the training provided, and quality of patient care in those facilities, the Company's financial performance, and the effectiveness of the Company's internal controls over financial reporting. Since then, the Company and the Individual Defendants intentionally and/or recklessly engaged in several self-serving schemes that caused harm to the Company.

4.      In breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly mismanaged the Company and its hospitals by: 1) causing UHS hospitals to adopt financially driven admission and retention practices that are not based upon the medical necessity of the patients; 2) systematically understaffing UHS hospitals and providing abysmal training to the hospitals' staff, ignoring the huge risks thereby imposed on the patients; and 3) causing UHS and UHS hospitals to be subject to government investigations and regulatory penalties arising from, at least, potential False Claims Act violations, Stark Law violations, and noncompliance with conditions required for participation in the Medicare/Medicaid program (collectively, "Willful or Reckless Mismanagement of the Hospitals").

- 3 -

5.      Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

6.      In further breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Individual Defendants made and/or caused the Company to make false and misleading statements and fail to disclose that, under their direction and on their watch: (1) UHS hospitals admitted and detained patients based on its own financial considerations and not upon the medical necessity of the patients; (2) UHS hospitals would keep patients admitted until their insurance payments ran out in order to ensure the maximum payment for its services; (3) UHS hospitals maintained inadequate staffing levels, deficient staff training, and substandard patient care quality; (4) UHS's revenues from inpatient care largely relied on its unlawful and unsustainable admission/retention practices; and (5) UHS lacked effective internal controls over financial reporting.

7.      Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein. While the price of the Company's Class B common stock was artificially inflated due to the false and misleading statements of material fact, a majority of the Individual Defendants engaged in lucrative insider sales.

8.      While enjoying the benefits themselves, the Individual Defendants caused the Company to incur a substantial loss by making the Company repurchase hundreds of millions of

Case ID: 170302824

dollars' worth of the Company's Class B stock at artificially inflated prices. Based on the Company's Class B stock price on December 7, 2016, the day the Individual Defendants' schemes were exposed, the Company had paid over $34 million more than the stock was worth.

9.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, losses due to defending the Company from the government subpoenas and investigations, losses arising from regulatory penalties, over $34 million in losses incurred because of the repurchases, losses suffered because of reputational injury, losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and five of  the Individual Defendants who received ill-gotten gains from insider sales netting proceeds of millions of dollars, and will cost the Company going forward many millions of dollars.

10.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors and are beholden to Defendant Alan B. Miller (Defendant Alan B. Miller's family has the voting power to elect five of the seven directors on the Company's board of directors (the "Board")), of the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to

Case ID: 170302824

commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over each Defendant named herein.  The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court. UHS is a corporation that conducts business and operations in this County. Each Defendant has sufficient minimum contacts with Pennsylvania so as to render the exercise of jurisdiction by the Pennsylvania courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court because one or more of the Defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting the Individual Defendants' breaches of their fiduciary duties owed to UHS Common Stockholders, occurred in this County, and Defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County. Venue and jurisdiction are additionally proper in this County because many of the acts complained of herein occurred, at least in part, in this County.

## PARTIES

### Plaintiff

14.     Plaintiff is a current shareholder of UHS common stock. Plaintiff has continuously held UHS common stock since before the beginning of the Relevant Period.

- 6 -

Case ID: 170302824

**Nominal Defendant UHS**

15.     Nominal Defendant UHS is a Delaware corporation with its principal executive offices at 367 South Gulph Road, King of Prussia, Pennsylvania 19406.

16.     UHS stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "UHS."

**Defendant B. Miller**

17.     Defendant Alan B. Miller ("B. Miller") was the Company's Chairman of the Board and CEO since 1978 and previously served as President until May 2009. Defendant B. Miller is a member of the Executive Committee and the Finance Committee. According to the Company's Schedule 14A filed with the SEC on April 7, 2016 (the "2016 Proxy Statement"), as of March 22, 2016, Defendant B. Miller beneficially owned: 1) 5,163,885 shares of the Company's Class A common stock, which was 69.1% of the Company's outstanding Class A common stock; 2) 8,312,380 shares of the Company's Class B common stock, which was 6.6% of the Company's outstanding Class B common stock; and 3) 661,688 shares of the Company's Class C common stock, which was 99.7% of the Company's outstanding Class C common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant B. Miller beneficially owned over $988 million worth of UHS Class B stock.

18.     The Company's 2016 Proxy Statement stated that "as of March 22, 2016, the shares of Class A and Class C Common Stock constituted 7.5% of the aggregate outstanding shares of our Common Stock, had the right to elect five members of the Board of Directors and constituted 86.4% of our general voting power; and as of that date the shares of Class B and Class D Common

- 7 -

Case ID: 170302824

Stock (excluding shares issuable upon exercise of options) constituted 92.5% of the outstanding shares of our Common Stock, had the right to elect two members of the Board of Directors and constituted 13.6% of our general voting power." The 2016 Proxy Statement further disclosed that "the family of Alan B. Miller holds more than 95% of the shares of Class A and Class C Common Stock, which is entitled to elect 80% of the entire Board of Directors and constitutes more than 50% of our aggregate voting power." According to the Company's annual report filed with the SEC on February 25, 2016 (the "2015 10-K"), the Company acknowledged that "[s]ince a substantial majority of the Class A shares and Class C shares are controlled by Mr. Alan B. Miller and members of his family, one of whom (Marc D. Miller) is also a director and officer of our company, and they can elect a majority of our company's directors and effect or reject most actions requiring approval by stockholders without the vote of any other stockholders, there are potential conflicts of interest in overseeing the management of our company."

19.     For the fiscal year 2015, Defendant B. Miller received $20,477,031 in compensation from the Company, which included $1,568,310 in salary, $1,500,022 in stock awards, $12,553,430 in option awards, $3,434,599 in non-equity incentive plan compensation, and $1,370,948 in all other compensation.

20.     As determined by the Compensation Committee, 100% of Defendant B. Miller's annual incentive bonus for 2016 and 2015 will be/was determined using the corporate performance criteria. Pursuant to the Executive Incentive Plan and the formula approved by the Compensation Committee with respect to the years ending December 31, 2016 and 2015, "each executive officer is entitled to receive between 0% and 250% of that executive officer's target bonus based, either entirely or in part, on the Company's achievement of a combination of: (i) a specified range of

Case ID: 170302824

target levels of adjusted net income per diluted share attributable to UHS, and; (ii) a specified range of target levels of return on capital (adjusted net income attributable to UHS divided by quarterly average net capital) for the years ending December 31, 2016 and 2015." Clearly, the Company's executive compensation plan is primarily designed to reward financial performance of the Company, rather than its operational excellence.

21.     Defendant B. Miller received an annual incentive bonus of 219% of his annual base salary in 2015. All his other compensation consists of the following: (i) $25,000 for professional tax services; (ii) $13,846 for payment of country club dues; (iii) $2,548 for accounting services; (iv) $2,707 for maintenance on personal residence; (v) $1,530 for fuel and maintenance charges incurred in connection with his automobile; (vi) $300 wireless stipend; and (vii) $460 for sporting event tickets.

22.     Based upon information and belief, Defendant B. Miller is a citizen of the state of Pennsylvania.

23.     The Company disclosed the following relationships and related transactions involving Defendant B. Miller in the 2016 Proxy Statement:

> Alan B. Miller is the Chairman of our Board of Directors and our Chief Executive Officer. Alan B. Miller also serves as Chairman of the Board of Trustees, Chief Executive Officer and President of Universal Health Realty Income Trust ("UHT"), a publicly traded real estate investment trust which commenced operations in 1986. The Company acts as advisor to UHT pursuant to the terms of an annually renewable advisory agreement and also leases the real property of certain of its facilities from UHT.

> Marc D. Miller is a member of our Board of Directors and President of the Company. Marc D. Miller is the son of Alan B. Miller, the Chairman of our Board of Directors and our Chief Executive Officer. Marc D. Miller is a named executive officer and therefore the salary and other compensation arrangements between us and Marc D. Miller are disclosed and described throughout this Proxy Statement. Additionally, Marc D. Miller serves as a member of the Board of Trustees of UHT,

- 9 -

Case ID: 170302824

and also serves as a member of the Board of Directors of Premier, Inc., a healthcare performance improvement alliance which contracts with the Company pursuant to a group purchasing agreement. All fees earned by Marc D. Miller in his capacity as a Board member of Premier, Inc. are paid to the Company.

Anthony Pantaleoni, a member of our Board of Directors and a member of the Executive Committee, is Of Counsel to Norton Rose Fulbright US LLP, the law firm we use as outside corporate counsel. This law firm also provides personal legal services to Alan B. Miller, our Chief Executive Officer. Mr. Pantaleoni is also the trustee of certain trusts for the benefit of Alan B. Miller and his family.

24.     The 2016 Proxy Statement stated the following about Defendant B. Miller:

Alan B. Miller has been a Director of the Company since 1978. Mr. Alan Miller has been the Company's Chairman of the Board and Chief Executive Officer since 1978, when he founded the Company. Prior thereto, he was President, Chairman of the Board and Chief Executive Officer of American Medicorp, Inc. Mr. Alan Miller currently serves as Chairman of the Board of Trustees, Chief Executive Officer and President of Universal Health Realty Income Trust. He was formerly a Director of Penn Mutual Life Insurance Company from 1994 until February 2013. Mr. Alan Miller oversees all of the Company's businesses, its operations, development and overall strategy. As a result of his many years of service, Mr. Alan B. Miller provides expertise on the hospital management industry.

**Defendant D. Miller**

25.     Defendant Marc D. Miller ("D. Miller") is the son of Defendant B. Miller. He has been a Director of the Company since 2006 and was appointed President of the Company in May 2009. Previously he has served in various management positions for the Company. Defendant D. Miller is a member of the Executive Committee and the Finance Committee. According to the Company's 2016 Proxy Statement, as of March 22, 2016, Defendant D. Miller beneficially owned: 1) 1,641,815 shares of the Company's Class A common stock, which was 24.9% of the Company's outstanding Class A common stock; and 2) 2,507,596 shares of the Company's Class B common stock, which was 2.6% of the Company's outstanding Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant D. Miller beneficially owned over $298 million worth of UHS Class B stock.

Case ID: 170302824

26.     As disclosed in the Company's 2016 Proxy Statement and the 2015 10-K, Defendant D. Miller, together with his father, Defendant B. Miller, owns "more than 95% of the shares of Class A and Class C Common Stock," which is entitled to "elect 80% of the entire Board of Directors" and constitutes "more than 50% of the [Company's] aggregate voting power." Defendants D. Miller and B. Miller exercise "concentrated control" over the Company. They "can elect a majority of [the] [C]ompany's directors and effect or reject most actions requiring approval by stockholders without the vote of any other stockholders," resulting in "potential conflicts of interest in overseeing the management of our company."

27.     For the fiscal year 2015, Defendant D. Miller received $3,659,338 in compensation from the Company, which included $695,027 in salary, $1,914,930 in option awards, $989,371 in non-equity incentive plan compensation, and $13,877 in all other compensation.

28.     As determined by the Compensation Committee, 100% of Defendant D. Miller's annual incentive bonus for 2016 and 2015 will be/was determined using the corporate performance criteria. In 2015, Defendant B. Miller received an annual incentive bonus of 142% of his annual base salary.

29.     Based upon information and belief, Defendant D. Miller is a citizen of the state of Pennsylvania.

30.     The Company disclosed the following relationships and related transactions involving Defendant B. Miller in the 2016 Proxy Statement:

> Marc D. Miller is a member of our Board of Directors and President of the Company. Marc D. Miller is the son of Alan B. Miller, the Chairman of our Board of Directors and our Chief Executive Officer. Marc D. Miller is a named executive officer and therefore the salary and other compensation arrangements between us and Marc D. Miller are disclosed and described throughout this Proxy Statement. Additionally, Marc D. Miller serves as a member of the Board of Trustees of UHT,

Case ID: 170302824

and also serves as a member of the Board of Directors of Premier, Inc., a healthcare performance improvement alliance which contracts with the Company pursuant to a group purchasing agreement. All fees earned by Marc D. Miller in his capacity as a Board member of Premier, Inc. are paid to the Company.

31.     The 2016 Proxy Statement stated the following about Defendant D. Miller:

Marc D. Miller has been a Director of the Company since 2006 and was appointed President of the Company in May 2009. Previously he has served in various management positions including: Senior Vice President and Co-Head of our Acute Care Division (2007-2009); Vice President, Acute Care Division (2004-2007); and, Assistant Vice President and Group Director of the Acute Care Division, Eastern Region (2003-2004). He has also served in other management positions at various acute care hospitals from 1999 to 2003. Additionally, Mr. Marc D. Miller serves as a member of the Board of Trustees of Universal Health Realty Income Trust and as a member of the Board of Directors of Premier, Inc. Mr. Marc D. Miller provides expertise on the hospital management industry.

**Defendant Filton**

32.     Defendant Steve G. Filton ("Filton") was elected Senior Vice President and CFO in 2003 and he was elected Secretary in 1999. According to the Company's 2016 Proxy Statement, as of March 22, 2016, Defendant Filton beneficially owned 429,188 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant Filton beneficially owned over $51 million worth of UHS Class B stock.

33.     For the fiscal year 2015, Defendant Filton received $2,721,954 in compensation from the Company, which included $566,022 in salary, $1,489,390 in option awards, $619,794 in non-equity incentive plan compensation, and $17,443 in all other compensation.

34.     As determined by the Compensation Committee, 100% of Defendant Filton's annual incentive bonus for 2016 and 2015 will be/was determined using the corporate performance criteria. In 2015, Defendant Filton received an annual incentive bonus of 110% of his annual base salary.

- 12 -

Case ID: 170302824

35.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Filton sold 15,000 shares of Company Class B stock for $136.01 per share on June 2, 2016, based on inside information.  He received about $2,040,150 in proceeds from this transaction.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes alleged herein.

36.     Based upon information and belief, Defendant Filton is a citizen of the state of Pennsylvania.

**Defendant Pantaleoni**

37.     Defendant Anthony Pantaleoni ("Pantaleoni") has been a Director of the Company since 1982. Defendant Pantaleoni is a member of the Executive Committee and the Finance Committee. According to the Company's 2016 Proxy Statement, as of March 22, 2016, Defendant Pantaleoni beneficially owned: 1) 633,138 shares of the Company's Class A common stock; 2) 822,436 shares of the Company's Class B common stock; and 3) 2,192 shares of the Company's Class C common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant Pantaleoni beneficially owned approximately $98 million worth of UHS Class B stock.

38.     As disclosed in the Company's 2016 Proxy Statement, Defendant Pantaleoni's Class B stock holding "[i]ncludes 171,426 shares held by the three 2011 Family Trusts for the benefit of Alan B. Miller's three children." Defendant Pantaleoni and Defendant Miller are both trustees of the 2011 Family Trusts. Additionally, Defendant Pantaleoni's Class A stock holding

- 13 -

Case ID: 170302824

"[i]ncludes 356,700 shares held by the 2012 Family Trust for the benefit of Alan B. Miller's three children." Defendant Pantaleoni "is the Trustee of Marc D. Miller's shares (118,900)" and Defendant Pantaleoni "has sole voting power with respect to Marc D. Miller's shares." Defendant Pantaleoni's Class A stock holding also includes "258,630 shares held by The Alan B. Miller 2002 Trust," of which Defendant Pantaleoni is the trustee and "has sole voting power with respect to these shares."

39.     For the fiscal year 2015, Defendant Pantaleoni received $360,155 in compensation from the Company, which included $41,000 in salary and $319,155 in option awards.

40.     The Company disclosed the following relationships and related transactions involving Defendant Pantaleoni in the 2016 Proxy Statement:

> Anthony Pantaleoni, a member of our Board of Directors and a member of the Executive Committee, is Of Counsel to Norton Rose Fulbright US LLP, the law firm we use as outside corporate counsel. This law firm also provides personal legal services to Alan B. Miller, our Chief Executive Officer. Mr. Pantaleoni is also the trustee of certain trusts for the benefit of Alan B. Miller and his family.

41.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, on May 5, 2016, Defendant Pantaleoni sold 6,995 shares of Company stock for $133.51 per share.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes alleged herein.

42.     The 2016 Proxy Statement stated the following about Defendant Pantaleoni:

> Anthony Pantaleoni has been a Director of the Company since 1982. He is Of Counsel to the law firm of Norton Rose Fulbright US LLP and he was a partner from 1970 to 2000. His corporate representation has involved a variety of complex transactions, including mergers, acquisitions, joint ventures, leveraged buyouts,

- 14 -

Case ID: 170302824

exchange offers and corporate restructurings. Additionally, he has had substantial experience in public offerings and private placements of securities, having represented both issuers and investment banking firms in these transactions. Clients represented by Mr. Pantaleoni have included a wide variety of companies, such as a supplier of products that analyze medical health costs. Mr. Pantaleoni provides expertise on legal matters.

**Defendant McDonnell**

43.     Defendant Eileen C. McDonnell ("McDonnell") has been a Director of the Company since April 2013. Defendant McDonnell is a member of the Audit Committee. According to the Company's 2016 Proxy Statement, as of March 22, 2016, Defendant McDonnell beneficially owned 9,713 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant McDonnell beneficially owned approximately $1.15 million worth of UHS Class B stock.

44.     For the fiscal year 2015, Defendant McDonnell received $374,655 in compensation from the Company, which included $55,500 in salary and $319,155 in option awards.

45.     Based upon information and belief, Defendant McDonnell is a citizen of the state of Pennsylvania.

46.     The 2016 Proxy Statement stated the following about Defendant McDonnell:

Eileen C. McDonnell was appointed a Director of the Company in April, 2013. Ms. McDonnell currently serves as Chairman and Chief Executive Officer of The Penn Mutual Life Insurance Company. She joined Penn Mutual in 2008 and previously served as President of the company. Ms. McDonnell was also appointed to The Penn Mutual Board of Trustees in 2010. Before joining Penn Mutual, Ms. McDonnell founded ExecMPower, a strategic planning and executive coaching consultancy. Previously, she was president of New England Financial, a wholly owned subsidiary of MetLife, and senior vice president of the Guardian Life Insurance Company. Ms. McDonnell also serves on the Board of Managers of Janney Montgomery Scott LLC, a wholly owned subsidiary of Penn Mutual. In 2012, Ms. McDonnell was named Chairman of the Insurance Federation of Pennsylvania and to the Board of the American Council of Life Insurers. She is also

Case ID: 170302824

a national advisor to Vision 2020, an initiative of Drexel University College of Medicine Institute for Women's Health and Leadership. Ms. McDonnell provides expertise on the insurance industry and financial matters.

**Defendant Hotz**

47.     Defendant Robert H. Hotz ("Hotz") has been a Director of the Company since 1991. Defendant Hotz is the Chair of the Compensation Committee and the Nominating & Corporate Governance Committee. He is also a member of the Audit Committee, the Executive Committee, and the Finance Committee. According to the Company's 2016 Proxy Statement, as of March 22, 2016, Defendant Hotz beneficially owned 53,661 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant Hotz beneficially owned approximately $6.4 million worth of UHS Class B stock.

48.     For the fiscal year 2015, Defendant Hotz received $384,655 in compensation from the Company, which included $65,500 in salary and $319,155 in option awards.

49.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, on March 8, 2016, Defendant Hotz sold 7,077 shares of Company stock for $113.06 per share.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes alleged herein.

50.     The 2016 Proxy Statement stated the following about Defendant Hotz:

Robert H. Hotz has been a Director of the Company since 1991. He is Senior Managing Director, Global Co-Head of Corporate Finance and Co-Chairman of Houlihan Lokey Howard & Zukin. He has also been a member of the Board of Directors and Operating Committee of Houlihan Lokey Howard & Zukin since June 2002. Mr. Hotz previously served as Chairman of the Board of Directors of

- 16 -

Case ID: 170302824

Pep Boys–Manny, Moe & Jack, and was former Senior Vice Chairman, Investment Banking for the Americas, of UBS LLC. Mr. Hotz provides expertise on financial and strategic advisory matters.

**Defendant Herrell**

51.     Defendant John H. Herrell ("Herrell") has been a Director of the Company since 1993. Defendant Herrell is the Chair of the Audit Committee and a member of the Compensation Committee and the Nominating & Corporate Governance Committee. According to the Company's 2016 Proxy Statement, as of March 22, 2016, Defendant Herrell beneficially owned 29,267 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant Herrell beneficially owned approximately $3.5 million worth of UHS Class B stock.

52.     For the fiscal year 2015, Defendant Herrell received $383,155 in compensation from the Company, which included $64,000 in salary and $319,155 in option awards.

53.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Herrell made the following sales of Company stock.  On December 14, 2015, Defendant Herrell sold 1,200 shares of Company stock for $117.38 per share.  On May 11, 2016, Defendant Herrell sold 6,000 shares of Company stock for $136.09 per share.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes alleged herein.

54.     The 2016 Proxy Statement stated the following about Defendant Herrell:

John H. Herrell has been a Director of the Company since 1993. He was the former Chief Administrative Officer of the Mayo Foundation from 1993 through 2002. Mr. Herrell was the Chief Financial Officer of the Mayo Foundation from 1984 until 1993 and held various other capacities since 1968. Mr. Herrell provides expertise on health care companies and financial matters.

- 17 -

**Defendant Gibbs**

55.     Defendant Lawrence S. Gibbs ("Gibbs") has been a Director of the Company since 2011. Defendant Gibbs is a member of the Audit Committee, the Compensation Committee and the Nominating & Corporate Governance Committee. According to the Company's 2016 Proxy Statement, as of March 22, 2016, Defendant Gibbs beneficially owned 7,504 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on March 22, 2016 was $118.91, Defendant Gibbs beneficially owned approximately $892,301 worth of UHS Class B stock.

56.     For the fiscal year 2015, Defendant Gibbs received $375,655 in compensation from the Company, which included $56,500 in salary and $319,155 in option awards.

57.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, on March 8, 2016, Defendant Gibbs sold 6,000 shares of Company stock for $112.14 per share. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes alleged herein.

58.     The 2016 Proxy Statement stated the following about Defendant Gibbs:

Lawrence S. Gibbs has been a Director of the Company since 2011. He has been a Managing Partner at Cannonball Trading, LLC since July 2014. Previously Mr. Gibbs was a Macro Portfolio Manager at Ramius LLC from March 2010 to July 2014. Prior thereto, he was a Portfolio Manager at Millennium Partners LLC from February 2009 to March 2010. Mr. Gibbs provides expertise on corporate finance and investment matters.

Case ID: 170302824

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

59.     By reason of their positions as officers, directors and/or fiduciaries of UHS and because of their ability to control the business and corporate affairs of UHS, the Individual Defendants owed UHS and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage UHS in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of UHS and its shareholders so as to benefit all shareholders equally.

60.     Each director and officer of the Company owes to UHS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of UHS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the officers and directors of UHS were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of UHS, the absence of good faith on their

- 19 -

Case ID: 170302824

part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised UHS's Board at all relevant times.

64.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.   Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

65.     To discharge their duties, the officers and directors of UHS were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of UHS were required to, among other things:

Case ID: 170302824

(a)      ensure that the Company operates in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, the United States, and pursuant to UHS's own Code of Business Conduct, Code of Ethics, and Code of Ethics for Senior Financial Officers;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how UHS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of UHS and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that UHS's operations would comply with all laws and UHS's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

- 21 -

Case ID: 170302824

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.      Each of the Individual Defendants further owed to UHS and the shareholders the duty of loyalty requiring that each favor UHS's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

67.      At all times relevant hereto, the Individual Defendants were the agents of each other and of UHS and were at all times acting within the course and scope of such agency.

68.      Because of their advisory, executive, managerial, and directorial positions with UHS, each of the Individual Defendants had access to adverse, non-public information about the Company.

69.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by UHS.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants

Case ID: 170302824

caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to engage in the Willful or Reckless Mismanagement of the Hospitals; (iii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iv) to artificially inflate the Company's stock price while the Company repurchased its own stock and a majority of Individual Defendants made illegal lucrative sales of Company stock based on material non-public information..

72.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to engage in the Willful or Reckless Mismanagement of the Hospitals, conceal material facts, fail to correct such misrepresentations, initiate repurchases when the Company's stock price was artificially inflated, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of UHS was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the

- 23 -

Case ID: 170302824

accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of UHS, and was at all times acting within the course and scope of such agency.

## CODE OF BUSINESS CONDUCT AND CORPORATE STANDARDS

75.     The Company's Code of Business Conduct and Corporate Standards ("Code of Business Conduct") provides the following:

All employees, officers and directors of the company and its subsidiaries:

1. Shall perform their duties in good faith and to the best of their ability.
2.  Shall refrain from any illegal conduct.
3. Shall not obtain any improper personal benefit by virtue of his or her employment with UHS, shall not misuse company assets or use corporate information or opportunities for personal gain, and shall not engage in any relationship or financial interest which is a conflict of interest with, or which interferes or has the potential to interfere with, the interests of UHS or any of its subsidiaries or facilities.
4. Shall not accept (1) any gift of more than nominal value or (2) any hospitality or entertainment which because of its source or value might influence the employee's, officer's or director's independent judgment in transactions involving UHS or any of its subsidiaries or facilities.
5. Shall disclose to the VHS compliance officer any financial interest or ownership interest or any other relationship that he or she (or a member of his or her immediate family) has with customers, vendors, or competitors of VHS or any of its subsidiaries or facilities.
6. Shall not engage in any business practice intended to unlawfully obtain favorable treatment or business from any government entity, physician, potion, vendor, or any other party in a position to provide such treatment or business.
7. Shall not solicit or receive from any person or entity, nor offer or give to any person or entity, anything of value if that person or entity is in a position to refer business to UHS or any of its facilities or if UHS or any of its facilities is in a position to refer business to that person or entity.
8. Shall not use confidential or proprietary information of UHS, its facilities, patients, vendors, or customers for his or her own personal benefit or for the benefit of any other person or entity, while employed at UHS or any of its subsidiaries, or at any time thereafter.

- 24 -

Case ID: 170302824

9. Shall not buy or sell UHS or any other stock based upon "insider" information about or involving UHS, not pass on any such information to others, including, but not limited to, friends and family members.

10. Shall not participate in any conduct, agreement or understanding (including agreements based upon a course of conduct) with a competitor of UHS or anyone else to illegally fix prices, agree to labor costs, allocate markets, engage in group boycotts, inappropriately manipulate or conceal information, misrepresent material facts, abuse privileged information or engage in any other unfair practice.

11. Shall not provide any gifts to any government or public agency representatives.

12. Shall notify either the UHS general counsel, the facility's compliance officer, or the chief executive officer of the UHS facility in which he or she works, who will in turn notify the UHS general counsel, immediately upon the receipt (at work or at home) of an inquiry, subpoena or other agency or government request for information regarding UHS or any of its subsidiaries or facilities (other than for medical records or other routine licensing matters).

13. Shall not destroy or alter any information or documents in anticipation of, or in response to, a request for documents by any applicable governmental agency or from a court of competent jurisdiction.

14. Shall not disclose confidential medical information pertaining to UHS facilities' patients without the express written consent of the patient and in accordance with applicable law and UHS facilities' applicable policies and procedures.

15. Shall not participate in any false billing of patients, government entities, or any other party.

16. Shall promptly report all suspected violations of this Code of Business Conduct and Corporate Standards by other employees, officers or directors to (1) the UHS compliance hotline (1-800-852-3449), or (2) the compliance post office box (Universal Health Services, Inc., P.O. Box 61823, King of Prussia, PA, 19406-8823), or (3) his or her immediate supervisor or the facility's compliance officer.

76.     In violation of the Code of Business Conduct, the Individual Defendants

consciously disregarded their obligations to: (1) perform their duties in good faith and to the best

of their ability; (2) refrain from any illegal conduct; (3) avoid obtaining any improper personal

benefit by virtue of their employment with UHS; (4) refrain from misusing company assets or

using corporate information or opportunities for personal gain; (5) avoid conflicts of interest; (6)

refrain from using confidential or proprietary information for personal benefit; (7) avoid trading

UHS stock based on insider information; (8) avoid participating in any false billing of patients,

- 25 -

Case ID: 170302824

government entities, or any other party; and (9) promptly report all suspected violations of the Code of Business Conduct by other employees, officers or directors.

## **CODE OF ETHICS**

77.     Pursuant to the Company's Code of Ethics and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

78.     The Code of Ethics provides, as to "Compliance with Laws, Rules and Regulations," that:

> You must respect and abide by all applicable laws, rules and regulations. Although you are not expected to know the details of all applicable laws, rules and regulations, you are expected to seek advice in accordance with guidelines described in Section 13 of this Code.

> In the event of litigation or government investigation, please consult with one or more of the persons, and in accordance with the guidelines, described in Section 13 below so that the Company may comply in full with all applicable laws, rules and regulations, including those relating to the retention of records.

79.     The Code of Ethics provides, as to "Insider Trading," that:

> Federal law and the policies of the Company prohibit you, either directly or indirectly through your family members or others, from purchasing or selling Universal Health Services, Inc. Shares while in the possession of material, non-public information concerning the Company. This same prohibition applies to trading in the stock of other publicly-held companies on the basis of material, non-public information.

> Material, non-public information is any information which could reasonably be expected to affect either the price of, or a decision to buy or sell, the stock of any company. If you are considering buying or selling Universal Health Services, Inc. shares because of inside information you possess, you should assume that such information is material.

> Federal law and Company policy also prohibit you from "tipping" family, friends or others regarding material, non-public information that you learn about the Company or any other publicly traded company in the course of your employment or other position with the Company. The same penalties apply, regardless of whether you derive any benefit from the trade.

Case ID: 170302824

80.     The Code of Ethics provides, as to "Conflicts of Interest," that:

A "conflict of interest" occurs when your private interest interferes, or has the potential to interfere, in any way with the interests of the Company. A conflict situation can arise when you take actions or have interests that may make it difficult to perform your Company work objectively and effectively. Conflicts of interest may also arise when you receive improper personal benefit, from the Company or otherwise, as a result of your employment or other position with the Company.

You should avoid any relationship or financial interest which gives rise to an actual or potential conflict of interest between the Company and you. Any activity which even appears to present a conflict of interest should be avoided or terminated unless, after disclosure to the appropriate level of management, it is determined that the activity is not harmful to the Company or otherwise improper.

81.     The Code of Ethics provides, as to "Company Opportunities," that:

You are prohibited from taking for yourself personally opportunities that are discovered through the use of Company property, information or position. You may not use Company property, information or position for personal gain and may not compete with the Company. You owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

82.     The Code of Ethics provides, as to "Competition and Fair Dealing," that:

You should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

83.     The Code of Ethics provides, as to "Protective and Proper Use of Company Assets," that:

You should endeavor to protect the Company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. You should immediately report any suspected incident of fraud or theft to a member of the Company's management. The Company's assets are to be used only for its legitimate business purposes and only by authorized employees or their designees. You should not use Company property for non-Company business, though incidental personal use may be permitted.

84.     The Code of Ethics provides, as to "Integrity of Financial Statements and Disclosures," that:

- 27 -

Case ID: 170302824

The integrity of the Company's financial statements and the disclosures contained in the filings with government agencies and in its press releases and other public statements is essential. All financial books, records and accounts must timely and accurately reflect transactions and events. You must comply with the Company's policies and practices that comprise its system of internal controls and disclosure controls and procedures and must provide full, fair, accurate, timely and understandable responses to all requests from any of the Company's senior management, independent or internal auditors or legal counsel for information in accordance therewith.

85.     The Code of Ethics provides, as to "Reporting of Illegal or Unethical Behavior," that:

You should report all actual or potential violations of laws, rules, regulations or of this Code in accordance with the guidelines described in Section 13 of this Code. You may submit your report confidentially and, if you wish, anonymously in accordance with the guidelines described in Section 13 of this Code.

86.     The Code of Ethics provides, as to "No Retaliation," that:

It is Company policy that you may not retaliate against any employee, officer or director of the Company, and no employee, officer or director of the Company may retaliate against you, for the reasonable good faith report of any actual or potential violation of any applicable law, rule or regulation or this Code.

87.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider sales, and unjust enrichment. In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to: (1) comply with the applicable laws and regulations; (2) protect corporate assets; (3) engage in fair dealing; (4) avoid using corporate opportunities for personal gain; (5) avoid conflicts of interest; (6) report violations of the Code of Ethics; (7) avoid insider trading; (8) refrain

Case ID: 170302824

from inappropriately using confidential information; (9) appropriately maintain the Company's books, records, accounts, and financial statements; and (10) make accurate filings with the SEC.

## UHS'S CODE OF ETHICS FOR SENIOR FINANCIAL OFFICERS

88.     The Company's Code of Ethics for Senior Financial Officers (the "SFO Code of Ethics") is applicable to the Company's CEO, CFO, Treasurer, Controller, Vice Presidents of Finance – Acute Care/Behavioral Health, and any other employees of the Company performing similar functions (the "Senior Financial Officers" or "SFOs").

89.     The SFO Code of Ethics provides, as to the purpose of the SFO Code of Ethics, that:

> The purpose of this Code is to codify those standards that the Company believes are reasonably designed to deter wrong-doing and to promote, on the part of the Senior Financial Officers, adherence to the following principles in all material respects:
>
> - Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
> - Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;
> - Compliance with applicable governmental laws, rules and regulations;
> - The prompt internal reporting to an appropriate person or persons identified in this Code of violations of this Code; and
> - Accountability for adherence to this Code. No provision of this Code, however, is intended to create any right in favor of any third party, including any stockholder, officer, director or employee of the Company or any subsidiary thereof, in the event of a violation of any provision of this Code.

90.     The SFO Code of Ethics provides, as to "Honest and Ethical Conduct and Ethical Handling of Conflicts of Interest," that:

> The Senior Financial Officers should conduct themselves and their activities on behalf of the Company, its subsidiaries and affiliated entities in an honest and ethical manner and in a manner which complies well this Code and in all material respects with the Company's Business Policies and Code of Conduct. To this end, the Senior Financial Officers should

- 29 -

Case ID: 170302824

endeavor to promote a culture of honesty, integrity, ethical behavior and accountability within the Company, its subsidiaries and affiliated entities whereby all employees are encouraged to conduct themselves and their activities on behalf of the Company, its subsidiaries and affiliated entities in an honest and ethical manner and in a manner which complies in all material respects with the Business Policies and Code of Conduct or any other applicable code of conduct of the Company.

The Senior Financial Officers should endeavor to avoid any actual or potential conflict of interest between their personal and professional relationships. The Senior Financial Officers should promptly report, and disclose all material facts relating to their relationships or financial interests which give rise, directly or indirectly, to an actual or potential conflict of interest to the Audit Committee of the Board. No Senior Financial Officer should knowingly become involved in any actual or potential conflict of interest without the relationship or financial interest having been approved by the Board or the Audit Committee thereof.

91.    The SFO Code of Ethics provides, as to "Disclosure in SEC Filings and Other Public Communications," that:

The Senior Financial Officers should conduct themselves and their activities on behalf of the Company, its Subsidiaries and affiliated entries in a manner which promotes the full, fair, accurate, timely and understandable disclosure, in accordance with applicable law, rules or regulations, of all material information required to be included in (i) each report or other document required to be filed or submitted by the Company with the SEC and (ii) in all other public communications made by the Company. To this end, the Senior Financial Officers should oversee the establishment and management of the Company's internal controls and disclosure controls and procedures to enable:

- The Company's consolidated financial statements and the notes thereto to present fairly, in all material respects, the financial position, the results of operations and the cash flows of the Company as of and for the period(s) indicated in conformity with accounting principles generally accepted in the United States; and
- The Senior Financial Officers to bring to the attention of the Audit Committee any information, of which they are aware, concerning (i) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

92.    The SFO Code of Ethics provides, as to "Compliance with Applicable Governmental Laws, Rules and Regulations," that:

Case ID: 170302824

The Senior Financial Officers are expected to comply, and should encourage and promote compliance by all employees of the Company, its subsidiaries and affiliated entities, with the governmental laws, rules and regulations applicable to their business and operations, including the retention and disposal of business documents and records.

93.     The SFO Code of Ethics provides, as to "Reporting Code Violations," that:

Senior Financial Officers should report any known or suspected violation of this Code by any Senior Financial Officer to the Company's chief executive officer, chief compliance officer and the Audit Committee (and any other appropriate committee) of the Board.

94.     In violation of the SFO Code of Ethics, the Individual Defendants who are Senior Financial Officers (Defendants B. Miller and Filton) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider sales, and unjust enrichment.  In violation of the SFO Code of Ethics, Defendant B. Miller and Defendant Filton consciously disregarded their duties to: (1) promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest; (2) oversee the establishment and management of the Company's internal controls and disclosure controls and procedures to enable full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with the SEC and in other public communications made by the Company; (3) comply with applicable governmental laws, rules and regulations; and (4) promptly report any known or suspected violation of the SFO Code of Ethics.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

95.     UHS's principal business is owning and operating, through its subsidiaries, acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers and

- 31 -

radiation oncology centers. As of February 25, 2016, it owned and/or operated 24 inpatient acute care hospitals, 3 free-standing emergency departments and 213 inpatient and 16 outpatient behavioral health care facilities located in 37 states, Washington, D.C., Puerto Rico, the U.S. Virgin Islands, and the United Kingdom.

96.     UHS is one of the largest operators of psychiatric centers (or behavioral health facilities) in the United States. According to the Company's 2015 10-K, net revenues from the Company's behavioral health care operations accounted for 49% of its consolidated net revenues during each of 2015 and 2014 and 51% during 2013.  Over 200 behavioral health facilities of UHS across the country admitted nearly 450,000 patients in 2015, resulting in almost $7.5 billion in revenues from inpatient care.

97.     UHS's psychiatric facilities are not branded with the Company name. The UHS Facilities Map can be found on the Company's website.[1]

### The UIC Report

98.     As early as 2011, a state-funded review conducted by the University of Illinois at Chicago ("UIC") on a UHS hospital had uncovered the hospital's pattern of admitting more patients than it had room for "in an effort to maximize financial profit."[2] Specifically, a report, based on the review and prepared for the Illinois Department of Children and Family Services (the "UIC Report"), stated, in relevant part:

**Sleeping patients on cots in hallways.**

The UIC reviewers were reliably informed by confidential sources that UHS Hartgrove officials had been routinely exceeding its licensed bed capacity since

---

[1] The UHS Facilities Map is available at: http://www.uhsinc.com/locations/uhs-facilities-map-usa/. A list of UHS psychiatric facilities can be found in the 2015 10-K.
[2] https://www.documentcloud.org/documents/3229504-Uhs-Hartgrove-Hospital-Review-University-Of.html#document/p30/a330585.

Case ID: 170302824

2007 in an effort to maximize financial profit; this practice reportedly increased in mid-2008 after DCFS placed an intake hold on Riveredge Hospital. UHS Hartgrove officials seized that opportunity, according to one reliable hospital source, to *"jam as many kids into the units as they could get away with."[3]*

During the course of gathering data for the current report, the UIC reviewers obtained copies of all surveys conducted at UHS Hartgrove by the Illinois Department of Public Health since 2008; the documents included an unannounced survey conducted by IDPH in March 2009, reportedly after the agency received a complaint about patients being slept on cots when the hospital exceeded its official licensed capacity.

While the findings of the 2009 IDPH survey are revealing by themselves, several UIC sources helped to frame the context surrounding the arrival of the surveyors at the hospital:

- First, the IDPH surveyors confirmed what the UIC team had been told was occurring: examining a sample of the daily census sheets for an approximate 90-day period from 12/3/08 to 2/28/09.

  **The hospital's authorized capacity was 136 beds at that time, but IDPH determined that the facility had been over-capacity on 52 days (or 60% of the time) during the 88-day sample period, on some days by as many as 17 beds.**

- What the IDPH surveyors could not have known at the time, of course, is that while they were in the first-floor conference room examining the daily census records for the hospital, the director of nursing was running through the inpatient units frantically yelling orders at the staff to *"Get rid of the cots, quickly; IDPH is in the building!"*

As amusing as the anecdote about the nursing director's frantic scurrying through the hospital units seemed when it was first related to the UIC reviewers by staff members who witnessed the event, it arguably speaks to the fact that senior officials at UHS Hartgrove fully understood the implications of the unannounced IDPH visit: specifically, that their decision to *"jam as many kids into the units as they could get away with,"* as one staff member put it, willfully ignored federal regulations about patients' rights to privacy as well as the right to receive care in a safe environment.[4]

---

[3] "According to several hospital sources, DCFS wards as well as non-wards were slept on movable cots in dayrooms, hallways and other areas of the units because there were no vacant bedrooms available; the cots would then be wheeled away in the morning to a storage room off of the gymnasium." (Footnote in Original.)

[4] *See 42 CFR § 482.13 (c)(1)(2)*. (Footnote in Original.)

Case ID: 170302824

What was never amusing at all, however, was the fact that over the course of several years hundreds of mentally ill children – DCFS wards and non-wards alike – were slept on rollaway cots in an overcrowded and frequently chaotic psychiatric hospital so that UHS corporate officials could take advantage of the opportunity to maximize profits.[5] [6]

(Emphasis in original.)

99.     Additionally, the UIC Report revealed the hospital's "woefully inadequate" staffing levels "even under normal circumstances." The report expressed concern over the fact that "patient safety and quality of care have directly suffered as a result of corporate-level decisions to minimize labor costs of facility operations." Specifically, the report stated, in relevant part:

**Inadequate staffing levels and staff supervision.**

When specifically questioned about whether UHS Hartgrove officials ever increased staffing levels to offset the sudden influx of patients when hospital units exceeded authorized bed-capacity, UIC sources indicated that this rarely occurred. In effect, then, *a de facto decrease in staffing ratios may occur at certain times when patients flood into the units beyond appropriate capacity.*

Holding aside the issue of UHS Hartgrove officials inflating hospital census whenever the opportunity arose, the more immediate concern for DCFS ought to be whether the facility provided adequate staffing levels under normal circumstances of daily operation.[7]

Based on the available evidence, it is reasonable to conclude that staffing levels at UHS Hartgrove are woefully inadequate even under normal circumstances, and that patient safety and quality of care have directly suffered as a result of corporate level decisions to minimize labor costs of facility operations:

- UHS Hartgrove officials clearly indicated an awareness of this issue when they reportedly told nursing managers they would provide extra staff to the

---

[5] "One DCFS ward told the UIC reviewers about waking up early on the adolescent boys unit one morning and seeing a newly admitted patient sleeping in a counselor's office with his head on a pillow that had been placed on the desk, apparently because there were no more cots." (Footnote in Original.)

[6] "As for these frantic efforts to obstruct or mislead the IDPH surveyors – who were at the hospital to conduct an investigation on behalf of the federal Center for Medicare and Medicaid Services – the UIC team will leave this matter for others to evaluate." (Footnote in Original.)

[7] As stated in the UIC Report, "[i]n this instance, 'normal circumstances' refers to staffing levels on hospital units when patient census is within limits that DCFS was led to understand – based on previous representations by UHS officials – could be appropriately managed by the available numbers of nursing and direct-care staff per shift."

Case ID: 170302824

hospital units during the course of the UIC review, the obvious intention being to present a misleading impression that unit staffing levels were higher than the usually scheduled pattern.

- However, following the intake hold imposed by DCFS on June 16 UIC reviewers immediately started receiving text messages and emails from sources confirming that staffing levels on the hospital units suddenly increased, apparently as a direct result of the DCFS action.

- UHS officials repeatedly stated to the UIC reviewers that the facility typically maintains a staff-to-patient ratio of 1:5, meaning the presence of one staff member to every five patients on the day and evening shifts when therapeutic programming activities are being conducted.[8]

- In fact, the UIC reviewers found evidence that Hartgrove units have operated as low as 1:6 or even 1:7 at times – as confirmed by direct-care staff who work on these units – posing alarming safety risks under any circumstances.

- Earlier in the current report it was noted that UIC reviewers observed a single staff member alone with 22 patients in a unit dayroom, a not infrequent occurrence of understaffing by default (even if the 1:5 ratio was, technically speaking, "scheduled-on-paper" on any given day).

- Similarly, a few days earlier on that same unit, three boys were left unmonitored by staff for 10-15 minutes, during which time they engaged in sexual acting-out behaviors.

- In September 2010 the *Chicago* Tribune reported on two sexual incidents at Hartgrove, one of which clearly related to understaffing: *"A 13-year-old male patient performed oral sex on a 15-year-old DCFS ward in a dayroom crowded with roughly 14 other youths and only one hospital employee to monitor them, records show. The worker said he was distracted by trying to defuse a 'conflict' among other youths in the room."*

(Emphasis in original.)

---

[8] "To place such numerical ratios in perspective, DCFS requires a staffing level of 1:3 – **40% higher than the 1:5 ratio at UHS Hartgrove** – for certain residential treatment providers, suggesting that many of the violent incidents and other behavior management problems observed at UHS Hartgrove are directly related to gross understaffing of the hospital's units." (Footnote in Original.)

- 35 -

Case ID: 170302824

100.    The UIC Report pointed out that the American Academy of Child & Adolescent Psychiatry's ("AACAP") model guidelines identified a 1:3 minimum staff ratios for hospitals providing acute treatment for children and adolescents with psychiatric illness to ensure effective treatment and quality of patient care. The 1:5 staffing levels supposedly maintained by the Hartgrove Hospital ("Hartgrove") are 40% less than AACAP's guidelines— "and even lower when considering such factors as units going over-capacity or staff being pulled from the floor for 'training.'"

101.    As noted in the UIC Report, "the repeated and willful failure by UHS officials to ensure that their staff were properly trained and supported in critical arears related to patient safety and quality of care" was "obscured." UHS hospital officials even "misrepresent[ed] training data about what is arguably the most critical area of patient safety and behavior management: the use of restraints." For example, UHS hospital issued certificates to staff who attended a CPI restraint training[9] "falsely indicating [they] had completed a full 3-hour CPI recertification training" while the training was "conducted in only one hour."

102.    The UIC Report also flagged broader concerns as the UIC review team "learned about troubling reports suggesting a pattern of quality of care issues, harm to patients, or major healthcare fraud charges involving UHS-operated facilities in a dozen other states beyond Illinois" during the course of its review.

103.    To date, the Company and its hospitals have become subject to numerous government investigations, as alleged herein. Among the facilities being investigated, Hartgrove

---

[9] The training includes physical interventions and personal safety techniques, which are designed to maximize the safety of everyone involved in a crisis situation. The intent of this sort of training intent of training is for staff to learn a system of verbal and physical intervention techniques that can help them recognize and address escalating behavior at its earliest stages—before it can escalate further.

- 36 -

Case ID: 170302824

has been under a criminal investigation conducted by the Criminal Frauds Section of the Department of Justice ("DOJ"). The criminal investigation into Hartgrove led investigators to turn their attention towards the UHS headquarters. According to a Form 8-K filed by the Company with the SEC on March 31, 2015 (the "3/31/15 8-K"), the Company was notified in late March 2015 that "the investigation conducted by the Criminal Frauds Section has been expanded to include UHS as a corporate entity" and that this arose out of the coordinated investigation of several of the Company's facilities, "in particular, Hartgrove Hospital." Another UHS facility subject to the Criminal Frauds Section investigation was River Point Behavioral Health ("River Point"), which was also investigated by the Central Office of the Centers for Medicare & Medicaid Services ("CMS") based on allegations, among others, that River Point "falsely and fraudulently doctor[ed] records and diagnos[ed] patients with a wide variety of psychiatric disorders in order to justify the continued detention of these persons in an inpatient environment such that they can be used as vehicles for Medicare billing."

104.    Notably, in April 2014, CMS instituted a Medicare payment suspension at River Point, which was followed by a Medicaid payment suspension issued by the Florida Agency for Health Care Administration. Despite several rebuttal attempts by River Point, CMS continued the payment suspension. In March 2015, UHS received notification from CMS that the payment suspension would be continued for another 180 days.

**Criteria for an Individual to be Admitted to a Psychiatric Facility**

105.    As provided by the Company, three main criteria are used to determine whether an individual should be admitted to a psychiatric facility:

"The first is suicide — if someone is suicidal, or at significant risk of harm to themselves. The second is whether there is a significant risk that the patient may

Case ID: 170302824

harm someone else, which is often referred to as homicidal. The third factor is whether the individual is gravely disabled and/or unable to care for themselves to the extent that their present psychiatric symptoms and diagnosis significantly interferes with their ability to complete critical daily activities." [10]

106.     The Company noted that "these admission criteria are uniform across all psychiatric facilities and are not at all unique to UHS."

107.     However, determining whether patients pose a true risk to themselves or others is difficult. The thoughts of suicide should not be evaluated in isolation, but together with a range of factors, including the patient's past history of psychiatric illness, previous suicide attempts, a recent change in the patient's mental state and whether the person has a plan to act on such thoughts.[11] Still, these criteria give psychiatric hospitals broad leeway to admit and hold patients, a power largely withheld from non-psychiatric medical facilities.

108.     UHS perfectly understands the flexibility its behavioral health facilities enjoy with respect to patient admissions. In a letter to BuzzFeed News, a news network that conducted a yearlong investigation into UHS, the Company stated the following:

> It is important to understand that mental health facilities and the patients that we treat are unique, and unlike traditional acute care hospitals or patients. Most of our patients are unable to make the same judgements regarding clinical care and appropriateness of admission and discharge that they might if undergoing other non-psychiatric medical treatment.

**Under the Individual Defendants' Direction and on Their Watch, UHS Hospitals Admitted and Detained Patients Based on Its Own Financial Considerations and Not Upon the Medical Necessity of the Patients**

---

[10] *See* http://www.uhsthefacts.com/myth-vs-fact/.
[11] *See* "American Psychiatric Association ("APA") Practice Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors," available at https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/suicide.pdf; *see also* David Norris, Molly S. Clark, "Evaluation and Treatment of the Suicidal Patient," American Family Physician (2012).

Case ID: 170302824

109.     Some UHS hospitals offer free mental health assessment to prospect patients to help them start "the journey to wellness." For example, Highlands Behavioral Health System ("Highlands"), a UHS behavioral health facility located in Colorado, posted the following on its website:

> Highlands can help - but only if you call. To speak with a caring professional or to schedule a free confidential assessment 24 hours a day, 7 days per week, please call

110.     The purpose for such assessments, however, is not what it appears to be. Based on information and belief, UHS tracked what UHS employees called each facility's "conversion rate": the percentage of callers who actually came in for psychiatric assessment, and the percentage of those people who became inpatients. When asked by BuzzFeed News about the conversion rate, Roz Hudson ("Hudson"), Divisional President of UHS's Behavioral Health Division, responded that "while it's standard in the industry to track various data points, 'it's not a number necessarily that the line staff are driven by.'"

111.     Contradicting what Hudson said, BuzzFeed News generated the following statements from the Company's former and current employees through its investigation:

> Karen Ellis, a former counselor at Salt Lake Behavioral Health ("Salt Lake"), said, "They keep track of our numbers as if we were car salesmen."

> A former admissions employee who worked at three UHS facilities in Texas said, "The goal when you're on the phone with someone is to always get them into the facility within 24 hours. And the reason for getting them into the facility is that once they stepped foot in, they are behind locked doors."

> A former intake worker at Salt Lake said, "People don't understand. They think we're going to diagnose them for anxiety or depression…Our goal is to admit them to the hospital."
> A former clinician at Salt Lake said, "Your job is to get patients. And you get them however you get them."

> Lauren Singer, who worked for six months at the front desk of Colorado's

- 39 -

Case ID: 170302824

Highlands Behavioral, said, "If someone came in voluntarily, I wasn't allowed to let them out of the door." She also disclosed that a button behind the receptionist's desk controlled the lock to the front door of the facility.

Paul Sexton ("Sexton"), the former CEO of Highlands, said in a statement to BuzzFeed News, "I deny any claims that any patients were ever wrongfully held or detained at Highlands. However, patients are not allowed to leave during an assessment for the safety of the patient, the facility, and the community."

112.    The patient admission and retention practices adopted by the Company's psychiatric hospitals, as reflected in the statements of its employees, vary from the "universal" criteria it claims to have followed and runs counter to the views of three leading organizations. According to BuzzFeed News, Dr. Steven Hoge, chair of the American Psychiatric Association's Council on Psychiatry and the Law stated that "[a]bsent a reason to be concerned about safety, their own or others', a person who voluntarily presents for an assessment would be free to leave." Ron Honberg, a senior policy adviser with the National Alliance on Mental Illness, said that "without a court order or a concern that the person poses a threat to himself or others, 'it's not permissible to hold someone.'" And Carly Moore Sfregola, a spokesperson for the American Hospital Association, wrote, "They get to leave at any time of their own free will unless someone gets a court order to involuntarily commit the patient."

113.    In order to keep the beds full, employees of UHS are instructed to exaggerate visitors' symptoms or to twist visitors' statements made during assessments to make them sound dangerous. A former admissions counselor at Millwood Hospital ("Millwood") told BuzzFeed News that she was told to "play up the criteria" to get insurers to approve hospitalization. A former clinical staff at Salt Lake also stated that after a patient was admitted, UHS's staff were trained to "chart to the negative" to make the patient sound less stable.

- 40 -

Case ID: 170302824

114.     Suicidal ideation "was one of those go-to formulas" for UHS intake workers, "[b]ecause that's the way to make sure everything gets paid for," stated Lacey Wilkinson, who worked in the admissions department at Millwood. Therapists, clinicians, and counselors from UHS hospitals told BuzzFeed News how they might infer or convince persons to admit that they were having suicidal ideation or a suicidal plan. For example, a therapist who performed assessments for University Behavioral Health, a UHS hospital in Texas, explained to BuzzFeed News that, with enough questions and prodding about suicide, "we can get the person to say, 'It's still on my mind.'" Similarly, a former clinician at Salt Lake said that intake assessments might start with the straightforward question, "Have you ever thought about suicide?," and then move on to the far more hypothetical, "If you had a plan, how would you do it?" Almost any answer could then be recorded as a plan.

115.     Medicare claims submitted by the Company correspond with UHS employees' statements. After analyzing five years of Medicare data obtained from ProPublica, BuzzFeed News noticed that:

> "[F]rom at least 2009, UHS hospitals steadily increased the frequency with which they described patients as experiencing suicidal ideation. By 2013, the code for suicidal ideation appeared in more than half of all of the Medicare claims submitted by UHS hospitals. This is four and a half times the rate for all non-UHS psychiatric hospitals.
>
> In the first full year after UHS bought about 100 hospitals from a competitor, Psychiatric Solutions Inc., or PSI, their use of the billing code for suicidal ideation in Medicare claims shot way up — more than sixfold overall."

116.     A manager who worked in the billing department at one of those hospitals bought by UHS said to BuzzFeed that after UHS bought the hospital, "we had to adjust to their ways… [Her superiors] really wanted us to be thorough and build the severity level as much as we could."

- 41 -

Case ID: 170302824

She explained that merely being depressed might not support admission, but "[i]f you're suicidal, a threat to yourself, you're more acute and it would better support admission."

117.    In fact, the pressure to admit more patients was so great that staff members at UHS facilities admitted patients even if those facilities were already at capacity, thinning resources even further.

118.    Rebecca Palmer, who worked at The Ridge Behavioral Health System, a UHS behavior health facility in Kentucky, recalled being told by her supervisors that "[i]f we didn't have beds, it doesn't matter — just go ahead admit them anyway." She described to BuzzFeed News how the hospital would manage this situation: "[E]very bed filled on the kid unit, teenagers boarding on the child's unit, and kids sleeping in the dayroom on rubber mats… And also in the seclusion rooms — they would be sleeping in there as well."

119.    Pursuant to 42 CFR § 482.13, seclusion "is the involuntary confinement of a patient alone in a room or area" and is "used for the management of violent or self-destructive behavior." Seclusion rooms are necessary to "ensure the immediate physical safety of the patient, a staff member, or others." Yet staff at four other UHS facilities also told BuzzFeed News that the seclusion rooms were "repurposed" when the facilities "ran out of regular beds."

120.    In 2014, Federal surveyors discovered that River Point had more patients than beds. A CMS Statement of Deficiency Form noted that "[a]n unannounced complaint survey was conducted by federal consulting surveyors in conjunction with Florida state surveyors from March 17-19, 2014." Even though River Point was licensed for only 93 beds at the time the survey was conducted, the surveyors found there were 99 patients in the facility. The surveyors also observed "mattresses … in a closet touching each other" or "on the floor." A hospital official told the

Case ID: 170302824

surveyors that "the use of mattresses on the floor is better than throwing a blanket on the floor." Surveyors further noticed that River Point "did not have a policy and procedure related to the cleaning and use of the mattresses."

121.     Defending the Company, Hudson, the Company's Divisional President of Behavioral Health Division, told BuzzFeed News that when there are "limited beds in the entire community," UHS's "responsibility is to be responsive to the needs of the patients." She added, "We're not abandoning the patient, we're taking care of the patient."

122.     Ironically, a UHS psychiatric hospital, Suncoast Behavioral Health ("Suncoast") in Bradenton, Florida, rejected a patient in desperate need of help.  The patient's name is Kevin Burns. He has been suffering from schizophrenia and depression for decades. When he again experienced an overwhelming impulse to cut himself, he went back to Suncoast, where he had been released from just two days beforehand. However, despite his begging for help, the hospital "barred the door, refusing even to let him in for an evaluation, something that many UHS hospitals, including Suncoast, advertise as a free service." Feeling desperate and helpless, Burns made several "quick, deep cuts to each wrist," using a razor he bought from a nearby Walmart.

123.     Florida's health care agency investigated Burns' case, and Suncoast was not able to give a plausible explanation as to why it would not let Burns in. Investigators ruled that Suncoast had violated emergency treatment laws. Suncoast admitted that it had violated state law, and was fined $1,000.

124.     The reason behind Suncoast's decision to leave a patient atrisk was not clear, but the statements from Suncoast's former employees seem to give a clue.

Case ID: 170302824

125.    "At Suncoast," three Suncoast employees told BuzzFeed News that "admissions decisions were simple. If the person has insurance, why haven't they been admitted? If they don't have insurance, why are they still here?"

126.    Palmer, the former intake employee who worked at UHS hospitals including Suncoast said that "[w]e had people with medical needs that we could not meet… [the hospital's leadership] would pressure us to accept them, just because they're paying customers." On the other hand, "If they couldn't pay, ship them out."

127.    According to Palmer, uninsured walk-in patients "sometimes waited for hours in the lobby as intake workers looked for another facility to transfer them to, explaining that there was no bed available." Sometimes there really wasn't a bed available, Palmer said, but "sometimes it wouldn't be true." A former Suncoast manager who is also a licensed nurse told BuzzFeed News that she found the hospital's management so unethical that she resigned.

128.    None of the workers interviewed by BuzzFeed News could affirmatively answer whether insurance factored into Suncoast's determination to lock Burns out, but a review of Burns' records revealed that his Medicaid provider had declined to pay for eight of the thirteen days the previous time he was hospitalized in Suncoast.

129.    In another UHS facility, the Millwood Hospital ("Millwood") in Texas, a patient named Trimble had a very different experience. Trimble went to Millwood for a free assessment and, without being aware of it, she signed a document granting her consent to be hospitalized. Hospital records show that Trimble filled out a form at 6:05 the next morning requesting a release, to which, Millwood did not respond until 4:30 in the afternoon.   Title 25 of the Taxes Administrative Code explicitly provides that within four hours of filling out a request for release,

Case ID: 170302824

patients must be discharged, unless a physician finds cause to hold them against their will. Millwood breached the rules and converted Trimble to involuntary commitment without much explanation.

130. Distinct from Burns' situation, Trimble's insurer had approved five days of treatment at Millwood for Trimble. In line with such an approval, Trimble's treatment plan provided for an estimated stay of five to seven days.

131. During the period when Trimble was held against her will, she called her mother to help get her out. Millwood refused to release Trimble and did not explain why Trimble could not leave. On her third day at Millwood, Trimble called the local police. An officer came to investigate, but the hospital refused to produce any paperwork to support Trimble's admission. The police report stated that a hospital supervisor told the officer "not to interfere with medical staff." As noted in the police report, the officer did not believe Trimble was a danger to herself or others. In fact, the officer believed that the hospital was violating Trimble's rights. Even so, the officer failed to help Trimble win her release.

132. Available evidence strongly suggests that UHS facilities have been following improper and financially-driven admission practices that are not based upon the medical necessity of the patients.

133. Indeed, "[t]wo dozen current and former employees from 14 UHS facilities across the country told BuzzFeed News that the rule was to keep patients until their insurance ran out in order to get the maximum payment." It was a "common practice" that was "openly discussed in regional conferences as well as phone calls with hospital executives," said Rick Buckelew ("Buckelew"), who ran Austin Lakes Hospital in Texas until 2014.

Case ID: 170302824

134.    Buckelew told BuzzFeed News: "If an insurance company gave you so many days, you were expected to keep the patient there that many days." Similarly, "three former heads of UHS hospitals said their divisional vice president, Sharon Worsham ("Worsham"), repeated a mantra: 'Don't leave days on the table.'"

135.    According to BuzzFeed News' investigation, this message passed from top officials to staff and doctors through "flash meetings" — "the daily gatherings in which administrators ran through the list of patients in the hospital, discussing treatment and discharge."

136.    More than 20 executives and managers in 12 states told BuzzFeed News that part of the purpose for those meetings was "to review how many days they have and to try to use up those days."

137.    As two former employees at Highlands revealed, during the time when Sexton was the CEO, he would "[run] down the list demanding an explanation for each early discharge" in each day's flash meetings. One employee recalled him saying "Why are they going home? They still have days left."

138.    Sexton told BuzzFeed News that "the purpose of such discussions was clinical. Any financial benefit was secondary and only applied if the patient met clinical criteria." However, Sexton explicitly described extending patient stays as a "strategy" to achieve financial goals in a draft of Highland's 2014 strategic plan. The strategic plan stated the following, in relevant part:

> **Strategic Goal #4: Growth**—*promoting self-sufficiency through innovative business strategies and strong financial decision-making* that reduces the cost of services and ensures our ability to carry out our mission for years to come.
>
> To achieve this goal, three strategic targets have been identified that includes:
>
> *(1)     Develop and implement a plan to increase average length of stay (ALOS).*
> (2)     Explore and expand new program opportunities.

- 46 -

(3)     Develop and implement a plan to increase average daily census (ADC).

(Emphasis added.)

139.

140.    In fact, psychiatrists at Highlands simply were not at liberty to decide patients' discharge date. They were "deeply disturbed" by the hospital's efforts to extend lengths of stay and felt "shamed" by being demanded to explain each "early" charge.  Indeed, in 2014, a staff psychiatrist at Highlands wrote an email to Worsham, a corporate divisional vice president, stating: "I am, in particular, deeply disturbed about the efforts to extend lengths of stay…. Doctors are publicly shamed by asking them to justify discharging a patient 'early' before the end of their insurance authorization." Worsham responded two weeks later by asking that he speak with the medical director of his hospital about his "perspective."

141.    The same practice and pattern was followed in other UHS facilities, such as Salt Lake. A hospital manager named Mark Tippins at Salt Lake said that managers like him were expected to pass the message they received in flash meetings along to doctors. He recalled conveying the message in "an understated approach" by saying, "Second floor" -- the hospital's administrative offices "wants me to see what we can do to get this patient to stay longer." Another former manager at Salt Lake said something similar: "We were just encouraged to talk them into staying until as long as insurance would cover." She went further to state that "[w]hatever manipulative strategies we could use, we were encouraged to." "If the patient was a mother," she told BuzzFeed News, "employees might threaten to call child protective services and have the patient's children removed from her care."

Case ID: 170302824

142.     Another UHS hospital, River Point, went even further. Under the lead of Gayle Eckerd ("Eckerd"), River Point established 10 days as the "guideline" for determining how long patients should be hospitalized.

143.     According to BuzzFeed News, eight current and former River Point employees and investigative documents indicated that "the hospital's true goal was to maximize government payments."

144.     However, this guideline adopted by River Point led to negative consequences for its patients, in addition to "the trauma of being confined against their will and the disruption to their lives and jobs." If a patient gets mental health care services in a psychiatric hospital that only cares for people with mental health conditions (instead of a general hospital), Medicare only covers up to 190 days of inpatient psychiatric hospital services during the patient's lifetime. Thus, spending those days when they weren't actually needed amounted to "taking away care that they're going to need later and they're not going to have," said a former discharge planner at Highlands.

145.     Eckerd, who ran River Point until 2014, kept close track of the facility's average length of stay. "Flash meetings were basically to discuss why patients were leaving before day 10," said a former River Point manager. If they left sooner, the manager continued, "you were questioned: 'Why were they leaving?'"

146.     According to BuzzFeed News analysis, "[i]n early 2009, the year Eckerd took over as CEO, just 37% of Medicare patients stayed for 10 days or more. By early 2010, the year UHS bought River Point, that rate had almost doubled to more than 70%." UHS kept Eckerd to lead River Point, and "the rate stayed high for years." Asked about the increase, Karen Johnson, UHS's Vice President of Clinical Services, told BuzzFeed News that River Point was "providing care

- 48 -

Case ID: 170302824

that's necessary for the patients." UHS expressed the same view. In its letter to BuzzFeed News, UHS explained, "Eckerd knew that medical research shows that short stays are associated with high readmission and suicide rates, so she established a 10-day guideline with the goal of providing patients with the medically necessary care they needed."

147.    However, as mentioned above, CMS conducted a "complaint survey" based on allegations that River Point employed various means to detain patients in order to use them as "vehicles for Medicare billing." The attached CMS ACTS Complaint/Incident Investigation Report identified the following issues concerning River Point:

> 1. falsely and fraudulently doctoring records and diagnosing Medicare beneficiaries with a wide variety of psychiatric disorders in order to justify the continued detention of these persons in an inpatient environment such that they can be used as vehicles for Medicare billing; 2. are providing unnecessary psychiatric services that could not be of any medical/psychological benefit to the patients; 3. following management's unwritten policy that all inpatients with insurance (including Medicare) were to be detained as inpatients for a minimum of ten days, regardless of the medical necessity for doing so. [R]outinely misusing the [] 72-hour involuntary commitment law in the State of Florida (known as the Baker Act) in order to unlawfully detain insured patients for the express purpose of billing their insurance for the inpatient stay; 4. Encouraging medially inappropriate admissions of patients with advanced dementia or organic brain disorders who had no possibility of psychiatric improvement in that their mental health issues were strictly neurological in nature; 5. falsely diagnosing patients with psychiatric disorder who actually went to the hospital for substance abuse treatment in order to keep these patients as inpatients for longer periods of time, as well as circumvent Medicare and other health insurance restrictions/limitations on inpatient substance abuse treatment; 6. Paying kickbacks to a patient recruiter for the provision of patients, many of whom were medically inappropriate for admission, when the hospital census dropped; and 7. Routinely falsifying patient medical records and other files in order to justify the medically unnecessary detention of the person as an inpatient

148.    Florida, the state where River Point was located, has an involuntary commitment law known as the Baker Act, which allows the involuntary institutionalization and examination of an individual for up to 72 hours.

- 49 -

Case ID: 170302824

149.     Michael Pruitt ("Pruitt") was brought by the police to River Point under the Baker Act in 2014. After arriving at River Point, he "repeatedly said he wasn't suicidal," and the hospital records indicated the same. When the 72 hours were up, he expected to go home. But, the hospital refused to release him.

150.     Instead, the hospital filed a petition in court. Just by filing the petition, the hospital obtained the legal right to detain Pruitt longer, at least until he had a court hearing.

151.     These court petitions are not supposed to be frequently used. But at River Point, three former therapists told BuzzFeed News, "filing them became standard practice."

152.     One former therapist told BuzzFeed News: "The rule of thumb is: If you came in under a Baker Act, we're going to file a petition, and then we figure out what the days situation is" with the insurance company. "If they didn't have insurance they were discharged…. But if they did have coverage," the former therapist said, "filing the petition would allow River Point to hold the patients in the hospital, and to keep the insurance money coming."

153.     Another data analysis done by BuzzFeed News showed that "in 2009, the year before UHS bought [River Point], [River Point] filed 238 petitions for involuntary commitment. Four years later, that number had grown to 1,362 — an increase of more than 470%."

154.     In its letter to BuzzFeed News, UHS attributed the increase in the number of court petitions largely to the increasing number of "geriatric patients" at River Point, "who commonly have challenging mental health issues requiring involuntary commitment."

155.     According to BuzzFeed News, therapists who filed the court petitions said the doctors gave little justification for holding the patient -- sometimes just a few words with almost no context -- and "[p]ublic defenders who represent Baker Act patients noted this as well." A

Case ID: 170302824

public defender in Duval County named Stephanie Jaffe said the petitions filed by River Point "were often legally insufficient and lacking in supporting documentation."

156.    Indeed, that was what happened to Pruitt. When Pruitt was held against his will, the CMS survey was ongoing. The CMS surveyors reviewed Pruitt's records and found out that Pruitt's doctors could not explain why he needed to be involuntarily hospitalized. As provided in the CMS Statement of Deficiency Form, the "Psychiatric/Medicine Progress Note" for Pruitt "did not document criteria sufficient for recurrent major depression, psychosis, or anxiety disorder." When asked about Pruitt's diagnosis, the doctor told the surveyors: "[P]robably a mood disorder. I've only known [him] a short time…maybe bipolar affective disorder, mixed or depression [not otherwise specified]." When asked what symptoms and history were available to justify this diagnosis, the doctor stated the only symptoms were "angry, irritable" and "mildly hostile." The doctor stated, "I don't have information to make a diagnosis. … I still don't have an established diagnosis."

157.    The surveyors found that River Point had failed "to ensure adequate assessment of the readiness for discharge" and told the hospital to correct its standards.

158.    River Point is not the only UHS hospital that has been cited by government regulators for violating a patient's right to be discharged or holding a patient without the proper documentation. For example, the Health Facilities and Emergency Medical Services Division of the Colorado Department of Public Health and Environment conducted an on-site complaint investigation on Highlands and noticed that "no documentation" was found supporting a particular patient's extended stay in the facility. Not discharging the patient at the time of the guardian's first request, the investigators concluded, "was a violation of the patient's rights."

- 51 -

**Under the Individual Defendant' Direction and on Their Watch, UHS Systematically Understaffed Its Hospitals and Failed to Provide Sufficient Training**

159.   Since 2011, the UIC Report had revealed UHS hospital's staffing problems, including inadequate staffing levels and poor staff supervision, especially considering the Company's pattern of admitting more patients than it had capacity for.

160.   "Several people who ran UHS hospitals" told BuzzzFeed News that "corporate bosses pushed them to cut their hospitals' staff further and further each year, regardless of the impact on employees' safety or on their ability to care for the people being admitted."

161.   According to BuzzFeed News: "Each year, hospital administrators presented their budgets to a panel of corporate leaders. And each year, people who were involved with the process say, corporate execs offered the same prescription: Cut more staff."

162.   Internal financial reports reviewed by BuzzFeed News show that in 2014, one UHS facility projected profit that was over 50%. Even as the facility had increased revenues in the previous years, it had continued to cut staff. "It was true greed," the person who ran that hospital said.

163.   The Company's decision to systematically understaff its facilities resulted in substandard patient care quality.

164.   According to a wrongful death suit filed against Highlands, the hospital "killed an opiate addict with opiates."

165.   The patient was a 22-year-old who had been cutting himself and was addicted to opiates. After his admission, to provide  pain relief, he was prescribed with fentanyl, a powerful synthetic opioid analgesic that is similar to morphine but that is much more potent.

- 52 -

Case ID: 170302824

166.    During the patient's stay in Highlands, he was negligently treated by irresponsible and unqualified doctors and nurses.  A nurse on the overnight shift "mistakenly wrote that the patient was due for a new dose even though he had just had a dose, resulting in his being "overmedicated" and "almost falling out of his chair." Pursuant to the patient's family's complaint, the nurse was "blank charting," or "documenting things that he had not observed or done." One night after the patient used a broken pencil to stab his thigh in the shower, he was put in a quiet room. The hospital staff was supposed to check on him every 15 minutes, but they never did. The staff members who were supposed to check his breathing "had only glanced in his room from the hallway." By 9:15 the next morning, his body was in "rigor mortis," and he had been dead for hours. The autopsy said he died of acute fentanyl toxicity.

167.    In statements to police, eight Highlands staff said they were "inadequately trained or understaffed." One nurse told police she had received just one day of training. The nurse who applied the last patch of fentanyl on the patient admitted that she had very little experience with the drug and told police that "[i]t's impossible to check every single… medication on every … [Medication Administration Record] for over thirty patients." A hospital supervisor told police that the hospital "hire[d] people with no nursing experience whatsoever." She said she was given the supervisory position only several months after she got her nursing license and this hospital practice of moving new nurses into management roles put patients at "huge risk." Also, she stated that "people usually don't stay more than three or four months."

168.    It was not just Highlands. Numerous other UHS hospitals have been cited by federal regulators for poor staffing. Nancy Smith ("Smith"), who worked as a corporate director of clinical

- 53 -

services until 2012, told BuzzFeed News that the Company "ignored her repeated pleas about insufficient staffing levels."

169.     Smith's job required her to review patient charts in about a dozen hospitals in four states. She often became alarmed "because doctors barely met with patients and the notes on charts didn't match up with the observations of floor staff." She described the number of staff in the hospitals she supervised as so low that it was "almost criminal" and "so unsafe." Yet, her concerns were ignored. Her superiors even told her that staffing concerns were "not your purview."

170.     Ultimately, Smith decided to retire. BuzzFeed News quoted her as saying, "the focus on minimal, minimal staffing, at the same time that they kept talking quality, just seemed so hypocritical. … I just couldn't endorse what they were doing, it was an ethical dilemma for me to keep on."

171.     Indeed, with such heavy caseloads, doctors who worked in UHS hospitals could only meet with patients "for only a few minutes each time, not nearly enough time to evaluate people with challenging psychiatric conditions."

172.     Among all clinical staff, "mental health technicians had the least training but frequently spent the most time with patients," said Smith. In BuzzFeed News interviews, "more than a dozen techs" said they "sometimes felt unsafe" as they struggled to monitor the high number of patients. Some said that they have "never been trained to run a group," and some said they were "just as clueless as the kids." Unsurprisingly, most of the heath technicians could not properly lead group psychotherapeutic sessions. A health technician at Havenwyck Hospital told BuzzFeed News that those group members she led left her groups "more confused than when they c[a]me in."

- 54 -

173.     While systematically understaffing the hospitals, the Company nevertheless pushed those hospitals to admit more patients, especially patients with insurance coverage.

174.     In this environment, both patients and employees said they often felt helpless. "You just hope there's no type of crisis," said Diana Westrick, who worked as a tech at Old Vineyard Behavioral Health in North Carolina. "I'm 5'2" — a small female — and I was left a lot with 12 to 18 patients by myself."

175.     "That was the worst clinical experience that I had — and I worked at a prison at one point," she said. At UHS, "we were saying to loved ones that we'll help them, and we didn't have nearly enough resources."

176.     One doctor who worked at Fairmount Hospital in Philadelphia said the culture of the hospital and the heavy patient loads were "eating my soul."

**False and Misleading Statements and Omissions**

177.     On August 7, 2015, the Company filed a quarterly report for the quarterly period ended June 30, 2015 on a Form 10-Q with the SEC ("2Q 2015 10-Q"), which was signed by Defendants B. Miller and Filton.

178.     The 2Q 2015 10-Q reported a revenue increase at the Company's behavioral health care facilities without disclosing that this increase was largely derived from the Company's unlawful and unsustainable admission practices.

179.     The 2Q 2015 10-Q contained an assurance that the Company's disclosure controls and procedures were effective, which stated as follows:

> As of June 30, 2015, under the supervision and with the participation of our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), we performed an evaluation of the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) or Rule 15d-15(e) under the

Case ID: 170302824

Securities Exchange Act of 1934, as amended (the "1934 Act"). Based on this evaluation, the CEO and CFO have concluded that our disclosure controls and procedures are effective to ensure that material information is recorded, processed, summarized and reported by management on a timely basis in order to comply with our disclosure obligations under the 1934 Act and the SEC rules thereunder.

180.     The 2Q 2015 10-Q also made an assurance regarding the Company's internal control over financial reporting, stating in relevant part:

There have been no changes in our internal control over financial reporting or in other factors during the second quarter of 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

181.     Attached to the 2Q 2015 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants B. Miller and Filton attesting to the accuracy of the 2Q 2015 10-Q.

182.     On November 6, 2015, the Company filed a quarterly report for the quarterly period ended September 30, 2015 on a Form 10-Q with the SEC ("3Q 2015 10-Q"), which was signed by Defendants B. Miller and Filton.

183.     The 3Q 2015 10-Q reported a continued revenue increase at the Company's behavioral health care facilities without disclosing that this increase was largely derived from the Company's unlawful and unsustainable admission practices.

184.     The 3Q 2015 10-Q contained an assurance that the Company's disclosure controls and procedures were effective, which stated as follows:

As of September 30, 2015, under the supervision and with the participation of our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), we performed an evaluation of the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) or Rule 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "1934 Act"). Based on this evaluation, the CEO and CFO have concluded that our disclosure controls and procedures are effective to ensure that material information is recorded, processed, summarized and reported by management on a timely basis in order to comply with our disclosure obligations under the 1934 Act and the SEC rules thereunder.

- 56 -

Case ID: 170302824

185.     The 3Q 2015 10-Q also made an assurance regarding the Company's internal control over financial reporting, stating in relevant part:

> There have been no changes in our internal control over financial reporting or in other factors during the third quarter of 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

186.     Attached to the 3Q 2015 10-Q were SOX certifications signed by Defendants B. Miller and Filton attesting to the accuracy of the 3Q 2015 10-Q.

187.     On February 25, 2016, the Company filed the 2015 10-K with the SEC.  The 2015 10-K was signed by all of the Individual Defendants.

188.     The Company stated in the 2015 10-K that the Company's "mission and objective is to provide superior healthcare services that patients recommend to families and friends, physicians prefer for their patients, purchasers select for their clients, employees are proud of, and investors seek for long-term results." To achieve this, the Company committed to:

- Service excellence
- Continuous improvement in measurable ways
- Employee development
- Ethical and fair treatment
- Teamwork
- Compassion
- Innovation in service delivery

189.     Concerning the Company's business strategy, the 2015 10-K stated the following, in relevant part:

> **Improvement of Operations of Existing Hospitals and Services.** We also seek to increase the operating revenues and profitability of owned hospitals by the introduction of new services, improvement of existing services, physician recruitment and the application of financial and operational controls.
>
> We are involved in continual development activities for the benefit of our existing facilities. From time to time applications are filed with state health planning

- 57 -

Case ID: 170302824

agencies to add new services in existing hospitals in states which require certificates of need, or CONs. Although we expect that some of these applications will result in the addition of new facilities or services to our operations, no assurances can be made for ultimate success by us in these efforts.

**Quality and Efficiency of Services.** Pressures to contain healthcare costs and technological developments allowing more procedures to be performed on an outpatient basis have led payors to demand a shift to ambulatory or outpatient care wherever possible. We are responding to this trend by emphasizing the expansion of outpatient services. In addition, in response to cost containment pressures, we continue to implement programs at our facilities designed to improve financial performance and efficiency while continuing to provide quality care, including more efficient use of professional and paraprofessional staff, monitoring and adjusting staffing levels and equipment usage, improving patient management and reporting procedures and implementing more efficient billing and collection procedures. In addition, we will continue to emphasize innovation in our response to the rapid changes in regulatory trends and market conditions while fulfilling our commitment to patients, physicians, employees, communities and our stockholders.

In addition, our aggressive recruiting of highly qualified physicians and developing provider networks help to establish our facilities as an important source of quality healthcare in their respective communities.

(Emphasis in Original.)

190.    Under the "Hospital Utilization" section of the 2015 10-K, the Company stated:

We believe that the most important factors relating to the overall utilization of a hospital include the quality and market position of the hospital and the number, quality and specialties of physicians providing patient care within the facility. Generally, we believe that the ability of a hospital to meet the health care needs of its community is determined by its breadth of services, level of technology, emphasis on quality of care and convenience for patients and physicians. Other factors that affect utilization include general and local economic conditions, market penetration of managed care programs, the degree of outpatient use, the availability of reimbursement programs such as Medicare and Medicaid, and demographic changes such as the growth in local populations. Utilization across the industry also is being affected by improvements in clinical practice, medical technology and pharmacology.

191.    The 2015 10-K advised that "the healthcare industry is subject to numerous laws,

regulations and rules" and assured the investors that the Company has "developed a comprehensive

- 58 -

ethics and compliance program that is designed to meet or exceed applicable federal guidelines and industry standards." Specifically, the Company stated, in pertinent part:

> We monitor all aspects of our business and have developed a comprehensive ethics and compliance program that is designed to meet or exceed applicable federal guidelines and industry standards… we believe our policies, procedures and practices comply with governmental regulations…

192.   The Company discussed the "intensified" competition it faced in the 2015 10-K and stated, in relevant part:

> The number and quality of the physicians on a hospital's staff are important factors in determining a hospital's success and competitive advantage. Typically, physicians are responsible for making hospital admissions decisions and for directing the course of patient treatment. We believe that physicians refer patients to a hospital primarily on the basis of the patient's needs, the quality of other physicians on the medical staff, the location of the hospital and the breadth and scope of services offered at the hospital's facilities. We strive to retain and attract qualified doctors by maintaining high ethical and professional standards and providing adequate support personnel, technologically advanced equipment and facilities that meet the needs of those physicians.

193.   The 2015 10-K contained an assurance that the Company's disclosure controls and procedures were effective, which stated as follows:

> As of December 31, 2015, under the supervision and with the participation of our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), we performed an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) or Rule 15d-15(e) of the Securities Exchange Act of 1934, as amended. Based on this evaluation, the CEO and CFO have concluded that our disclosure controls and procedures are effective to ensure that material information is recorded, processed, summarized and reported by management on a timely basis in order to comply with our disclosure obligations under the Securities Exchange Act of 1934, as amended, and the SEC rules thereunder.

194.   Similarly, the 2015 10-K made an assurance regarding the Company's internal control over financial reporting, stating in relevant part:

- 59 -

Case ID: 170302824

There have been no changes in our internal control over financial reporting or in other factors during the fourth quarter of 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

…

Management is responsible for establishing and maintaining an adequate system of internal control over our financial reporting. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria on *Internal Control—Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

…

Based on its assessment, management has concluded that we maintained effective internal control over financial reporting as of December 31, 2015, based on criteria in *Internal Control—Integrated Framework (2013)*, issued by the COSO. The effectiveness of the Company's internal control over financial reporting as of December 31, 2015 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm as stated in its report which appears herein.

195.    Attached to the 2015 10-K were SOX certifications signed by Defendants B. Miller and Filton attesting to the accuracy of the 2015 10-K.

196.    On May 6, 2016, the Company filed a quarterly report for the quarterly period ended March 31, 2016 on a Form 10-Q with the SEC ("1Q 2016 10-Q"), which was signed by Defendants B. Miller and Filton.

197.    The 1Q 2016 10-Q reported a net revenue increase of $37 million at the Company's behavioral health care facilities during the first quarter of 2016 without disclosing that this increase was largely derived from the Company's unlawful and unsustainable admission practices.

198.    The 1Q 2016 10-Q contained an assurance that the Company's disclosure controls and procedures were effective, which stated as follows:

As of March 31, 2016, under the supervision and with the participation of our

- 60 -

management, including our Chief Executive Officer ("CEO") and Chief Financial
Officer ("CFO"), we performed an evaluation of the effectiveness of our disclosure
controls and procedures, as defined in Rule 13a-15(e) or Rule 15d-15(e) under the
Securities Exchange Act of 1934, as amended (the "1934 Act"). Based on this
evaluation, the CEO and CFO have concluded that our disclosure controls and
procedures are effective to ensure that material information is recorded, processed,
summarized and reported by management on a timely basis in order to comply with
our disclosure obligations under the 1934 Act and the SEC rules thereunder.

199.    The 1Q 2016 10-Q also made an assurance regarding the Company's internal

control over financial reporting, stating in relevant part:

There have been no changes in our internal control over financial reporting or in other
factors during the first quarter of 2016 that have materially affected, or are reasonably
likely to materially affect, our internal control over financial reporting.

200.    Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants B.

Miller and Filton attesting to the accuracy of the 1Q 2016 10-Q.

201.    On August 5, 2016, the Company filed a quarterly report for the quarterly period

ended June 30, 2016 on a Form 10-Q with the SEC ("2Q 2016 10-Q"), which was signed by

Defendants B. Miller and Filton.

202.    The 2Q 2016 10-Q reported a net revenue increase of $22 million at the Company's

behavioral health care facilities during the second quarter of 2016 without disclosing that this

increase was largely derived from the Company's unlawful and unsustainable admission practices.

203.    The 2Q 2016 10-Q contained an assurance that the Company's disclosure controls

and procedures were effective, which stated as follows:

As of June 30, 2016, under the supervision and with the participation of our
management, including our Chief Executive Officer ("CEO") and Chief Financial
Officer ("CFO"), we performed an evaluation of the effectiveness of our disclosure
controls and procedures, as defined in Rule 13a-15(e) or Rule 15d-15(e) under the
Securities Exchange Act of 1934, as amended (the "1934 Act"). Based on this
evaluation, the CEO and CFO have concluded that our disclosure controls and
procedures are effective to ensure that material information is recorded, processed,
summarized and reported by management on a timely basis in order to comply with

Case ID: 170302824

our disclosure obligations under the 1934 Act and the SEC rules thereunder.

204. The 2Q 2016 10-Q also made an assurance regarding the Company's internal control over financial reporting, stating in relevant part:

> There have been no changes in our internal control over financial reporting or in other factors during the second quarter of 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

205. Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendants B. Miller and Filton attesting to the accuracy of the 2Q 2016 10-Q.

206. On November 8, 2016, the Company filed a quarterly report for the quarterly period ended September 30, 2016 on a Form 10-Q with the SEC ("3Q 2016 10-Q"), which was signed by Defendants B. Miller and Filton.

207. The 3Q 2016 10-Q reported a net revenue increase of $29 million at the Company's behavioral health care facilities during the third quarter of 2016 without disclosing that this increase was largely derived from the Company's unlawful and unsustainable admission practices.

208. The 3Q 2016 10-Q contained an assurance that the Company's disclosure controls and procedures were effective, which stated as follows:

> As of September 30, 2016, under the supervision and with the participation of our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), we performed an evaluation of the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) or Rule 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "1934 Act"). Based on this evaluation, the CEO and CFO have concluded that our disclosure controls and procedures are effective to ensure that material information is recorded, processed, summarized and reported by management on a timely basis in order to comply with our disclosure obligations under the 1934 Act and the SEC rules thereunder.

209. The 3Q 2016 10-Q also made an assurance regarding the Company's internal control over financial reporting, stating in relevant part:

Case ID: 170302824

There have been no changes in our internal control over financial reporting or in other factors during the third quarter of 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

210.   Attached to the 3Q 2016 10-Q were SOX certifications signed by Defendants B. Miller and Filton attesting to the accuracy of the 3Q 2016 10-Q.

211.   The statements referenced in ¶¶177-223 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Individual Defendants made and/or caused the Company to make false and misleading statements and fail to disclose that, under their direction and on their watch: (1) UHS hospitals admitted and detained patients based on its own financial considerations and not upon the medical necessity of the patients; (2) UHS hospitals would keep patients admitted until their insurance payments ran out in order to ensure the maximum payment for its services; (3) UHS hospitals maintained inadequate staffing levels, deficient staff training, and substandard patient care quality; (4) UHS's revenues from inpatient care largely relied on its unlawful and unsustainable admission/retention practices; and (5) UHS lacked effective internal controls over financial reporting.

**The Truth Emerges**

212.   On December 7, 2016, a BuzzFeed News Reporter named Rosalind Adams published an article on BuzzFeed entitled "Locked on the Psych Ward," detailing a year-long BuzzFeed News investigation into UHS. The investigation was "based on interviews with 175 current and former UHS staff, including 18 executives who ran UHS hospitals; more than 120 additional interviews with patients, government investigators, and other experts; and a cache of

- 63 -

Case ID: 170302824

internal documents." The article stated that the extensive investigation "raises grave questions about the extent to which [Universal Health's] profits were achieved at the expense of patients."

213.     The article drew readers' attention to the long-standing problems concerning the Company's admission practices and staffing levels. According to the article, "[c]urrent and former employees from at least 10 UHS hospitals in nine states said they were under pressure to fill beds by almost any method — which sometimes meant exaggerating people's symptoms or twisting their words to make them seem suicidal — and to hold them until their insurance payments ran out." These UHS hospitals "tried to keep beds filled even at the expense of the safety of their staff or the rights of the patients they were locking up." As noted in the article, in the corporate culture of UHS, "staff and patients 'were not a priority'… The priority was the bottom line."

214.     On this news, shares of UHS fell $15.01 per share, or nearly 12%, from its previous closing price to close at $111.36 per share on December 7, 2016. The stock price dropped to a low of $101.55 on December 14, 2016.

**UHS's and Its Hospitals' Misconduct Alleged Herein and Other Wrongdoings Committed Under the Direction of Individual Defendants Have Caused Them to Become Subject to Numerous Government Investigations and Regulatory Matters**

215.     As disclosed in the 3Q 2016 10-Q, the Company and its hospitals are party to various government investigations and regulatory matters:

*Office of Inspector General ("OIG") and Government Investigations:*

In April, 2013, the OIG served facility specific subpoenas on Wekiva Springs Center and River Point Behavioral Health requesting various documents from January, 2005 to the date of the subpoenas. In July, 2013, another subpoena was issued to Wekiva Springs Center and River Point Behavioral Health requesting additional records. In October, 2013, we were advised by the DOJ's Criminal Frauds Section that they received a referral from the DOJ Civil Division and opened an investigation of River Point Behavioral Health and Wekiva Springs Center. Subsequent subpoenas have since been issued to River Point Behavioral Health and

- 64 -

Case ID: 170302824

Wekiva Springs Center requesting additional documentation. *In April, 2014, the Centers for Medicare and Medicaid Services ("CMS") instituted a Medicare payment suspension at River Point Behavioral Health in accordance with federal regulations regarding suspension of payments during certain investigations. The Florida Agency for Health Care Administration subsequently issued a Medicaid payment suspension for the facility. River Point Behavioral Health submitted a rebuttal statement disputing the basis of the suspension and requesting revocation of the suspension. Notwithstanding, CMS continued the payment suspension. River Point Behavioral Health provided additional information to CMS in an effort to obtain relief from the payment suspension but the suspension remains in effect. In August, 2015, we received notification from CMS that, effective September, 2015, the payment suspension will be continued for another 180 days.* We cannot predict if and/or when the facility's suspended payments will resume. Although the operating results of River Point Behavioral Health did not have a material impact on our consolidated results of operations during the years ended December 31, 2015 or 2014, the payment suspension has had a material adverse effect on the facility's results of operations and financial condition.

In June, 2013, the OIG served a subpoena on Coastal Harbor Health System in Savannah, Georgia requesting documents from January, 2009 to the date of the subpoena.

In February, 2014, we were notified that the investigation conducted by the Criminal Frauds Section had been expanded to include the National Deaf Academy. In March, 2014, a Civil Investigative Demand ("CID") was served on the National Deaf Academy requesting documents and information from the facility from January 1, 2008 through the date of the CID. We have been advised by the government that the National Deaf Academy has been added to the facilities which are the subject of the coordinated investigation referenced above.

In March, 2014, CIDs were served on Hartgrove Hospital, Rock River Academy and Streamwood Behavioral Health requesting documents and information from those facilities from January, 2008 through the date of the CID.

In September, 2014, the DOJ Civil Division advised us that they were expanding their investigation to include four additional facilities and were requesting production of documents from these facilities. These facilities are Arbour-HRI Hospital, Behavioral Hospital of Bellaire, St. Simons by the Sea, and Turning Point Care Center.

In December, 2014, the DOJ Civil Division requested that Salt Lake Behavioral Health produce documents responsive to the original subpoenas issued in February, 2013.

- 65 -

Case ID: 170302824

In March, 2015, the OIG issued subpoenas to Central Florida Behavioral Hospital and University Behavioral Center requesting certain documents from January, 2008 to the date of the subpoena.

*In late March, 2015, we were notified that the investigation conducted by the Criminal Frauds Section had been expanded to include UHS as a corporate entity arising out of the coordinated investigation of the facilities described above and, in particular, Hartgrove Hospital.*

In December, 2015, we were notified by the DOJ Civil Division that the civil investigation also includes Arbour Hospital, Arbour-Fuller Hospital, Pembroke Hospital and Westwood Lodge located in Massachusetts.  To date, these facilities have not received any requests for documentation or other information.

*The DOJ has advised us that the civil aspect of the coordinated investigation referenced above is a False Claim Act investigation focused on billings submitted to government payers in relation to services provided at those facilities.* At present, we are uncertain as to potential liability and/or financial exposure of the Company and/or named facilities, if any, in connection with these matters.

In December, 2015, we were advised that the DOJ opened an investigation involving the El Paso Behavioral Health System in El Paso, Texas. *The DOJ is investigating potential Stark law violations relating to arrangements between the facility and physician(s) at the facility.*  These agreements were entered into before we acquired the facility as a part of our acquisition of Ascend Health Corporation in October, 2012. To our knowledge, this matter is not a part of the omnibus investigation referenced above.  At present, we are uncertain as to potential liability and/or financial exposure, if any, which may be associated with this matter.

In January, 2016, we were notified that the Department of Justice opened an investigation of the South Texas Health System of a potential False Claim Act case regarding compensation paid to cardiologists pursuant to employment agreements entered into in 2005.  At present, we are uncertain as to potential liability and/or financial exposure, if any, which may be associated with this matter.

*Regulatory Matters:*

On July 23, 2015, Timberlawn Mental Health System ("Timberlawn") received notification from CMS of its intent to terminate Timberlawn's Medicare provider agreement effective August 7, 2015. *This notification resulted from surveys conducted which alleged that Timberlawn was out of compliance with conditions of participation required for participation in the Medicare/Medicaid program.* We filed a request for expedited administrative appeal with the U.S. Department of Health and Human Services, Departmental Appeals Board, Civil Remedies

Case ID: 170302824

Division, seeking review and reversal of the termination action. In conjunction with the administrative appeal, we filed litigation in the U.S District Court for the Northern District of Texas seeking a temporary restraining order and preliminary injunction to have the termination stayed pending the conclusion of the administrative appeal. The trial court denied Timberlawn's request for a temporary restraining order and dismissed the case. Timberlawn's provider agreement was terminated effective August 14, 2015. In September, 2015 Timberlawn reached an agreement with CMS relative to its reapplication to the Medicare/Medicaid program.  In exchange, Timberlawn agreed to dismiss its administrative appeal as well as not to pursue an appeal of the decision of the trial court. During this time, Timberlawn has remained open. In December, 2015, Timberlawn received notice from the Texas Department of State Health Services ("TDSHS") of its intent to revoke Timberlawn's license and impose an administrative penalty.  We appealed and contested the proposed revocation and fine. We recently reached a settlement with TDSHS which resulted in their withdrawal of the intent to revoke Timberlawn's license and a reduced administrative penalty. Also during the third quarter of 2016, Timberlawn successfully completed all requirements of the settlement agreement with CMS which included passing the second of two required inspections. As a result, Timberlawn has been reenrolled in the Medicare program effective September 21, 2016.  Although the operating results of Timberlawn did not have a material impact on our consolidated results of operations or financial condition for the nine-month period ended September 30, 2016 or the year ended December 31, 2015, the termination of Timberlawn's provider agreement has had a material adverse effect on the facility's results of operations and financial condition.

*Other Matters:*

***In late September, 2015, many hospitals in Pennsylvania, including seven of our behavioral health care hospitals located in the state, received letters from the Pennsylvania Department of Human Services (the "Department") demanding repayment of allegedly excess Medicaid Disproportionate Share Hospital payments ("DSH") for the federal fiscal year 2011 ("FFY2011") amounting to approximately $4 million in the aggregate.*** In September, 2016, we received similar requests for repayment for alleged DSH overpayments for FFY2012. We filed administrative appeals for all of our facilities contesting the recoupment efforts for FFYs 2011 and 2012 as we believe the Department's calculation methodology is inaccurate and conflicts with applicable federal and state laws and regulations. The Department has agreed to postpone the recoupment of the state's share of the DSH payments until all hospital appeals are resolved but recently started recoupment of the federal share. ***If the Department is ultimately successful in its demand related to FFY2011 and FFY2012, it could take similar action with regards to FFY2013 and FFY2014.*** Due to a change in the Pennsylvania Medicaid State Plan and implementation of a CMS-approved Medicaid Section 1115 Waiver,

- 67 -

Case ID: 170302824

we do not believe the methodology applied by the Department to FFY2011 and FFY2012 is applicable to reimbursements received for Medicaid services provided after January 1, 2015 by our behavioral health care facilities located in Pennsylvania. We can provide no assurance that we will ultimately be successful in our legal and administrative appeals related to the Department's repayment demands. If our legal and administrative appeals are unsuccessful, our future consolidated results of operations and financial condition could be adversely impacted by these repayments.

*Matters Relating to Psychiatric Solutions, Inc. ("PSI"):*

The following matters pertain to PSI or former PSI facilities (owned by subsidiaries of PSI) which were in existence prior to the acquisition of PSI and for which we have assumed the defense as a result of our acquisition which was completed in November, 2010.

*Department of Justice Investigation of Friends Hospital:*

In October, 2010, Friends Hospital in Philadelphia, Pennsylvania, received a subpoena from the DOJ requesting certain documents from the facility. The requested documents were collected and provided to the DOJ for review and examination. Another subpoena was issued to the facility in July, 2011 requesting additional documents, which have also been delivered to the DOJ. All documents requested and produced pertained to the operations of the facility while under PSI's ownership prior to our acquisition. At present, we are uncertain as to the focus, scope or extent of the investigation, liability of the facility and/or potential financial exposure, if any, in connection with this matter.

*Department of Justice Investigation of Riveredge Hospital:*

In 2008, Riveredge Hospital in Chicago, Illinois received a subpoena from the DOJ requesting certain information from the facility. Additional requests for documents were also received from the DOJ in 2009 and 2010. The requested documents have been provided to the DOJ. All documents requested and produced pertained to the operations of the facility while under PSI's ownership prior to our acquisition. At present, we are uncertain as to the focus, scope or extent of the investigation, liability of the facility and/or potential financial exposure, if any, in connection with this matter.

(Emphasis Added.)

## **Repurchases During the Relevant Period**

Case ID: 170302824

216.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its Class B Common Stock that substantially damaged the Company.

217.     According to the Company's 3Q 2015 10-Q, during the three months ended September 30, 2015, the Individual Defendants caused the Company to repurchase 549,514 shares of its own Class B common stock at an average price per share of approximately $112.29, for a total cost to the Company of $61,705,000.

218.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $0.93 more than the actual worth of each share during the three months ended September 30, 2015.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended March 31, 2015 was approximately $511,048.

219.     According to the Company's 2015 10-K, during the three months ended December 31, 2015, the Individual Defendants caused the Company to repurchase 689,240 shares of its own Class B common stock at an average price per share of approximately $115.95, for a total cost to the Company of $79,920,000.

220.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $4.59 more than the actual worth of each share during the three months ended December 31, 2015.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended December 31, 2015 was approximately $3,163,611.

221.     According to the Company's 1Q 2016 10-Q, during the three months ended March 31, 2016, the Individual Defendants caused the Company to repurchase 1,453,504 shares of its

- 69 -

Case ID: 170302824

own Class B common stock at an average price per share of approximately $117.68, for a total cost to the Company of $171,042,000.

222.   Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $6.32 more than the actual worth of each share during the three months ended March 31, 2016.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended March 31, 2016 was approximately $9,186,145.

223.   According to the Company's 2Q 2016 10-Q, during the three months ended June 30, 2016, the Individual Defendants caused the Company to repurchase 463,921 shares of its own Class B common stock at an average price per share of approximately $146.79, for a total cost to the Company of $68,097,000.

224.   Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $35.43 more than the actual worth of each share during the three months ended June 30, 2016.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended June 30, 2016 was approximately $16,436,721.

225.   According to the Company's 3Q 2016 10-Q, during the three months ended September 30, 2016, the Individual Defendants caused the Company to repurchase 468,957 shares of its own Class B common stock at an average price per share of approximately $123.76, for a total cost to the Company of $58,038,000.

226.   Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on

- 70 -

Case ID: 170302824

average $12.40 more than the actual worth of each share during the three months ended September 30, 2016.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended September 30, 2016 was approximately $5,815,066.

227.   In total, the Company overpaid an aggregate amount of more than $34 million for repurchases of its own stock during the Relevant Period.

**Summary of Defendants' Wrongful Conduct**

228.   In breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly mismanaged the Company and its hospitals by: (1) causing UHS hospitals to adopt financially driven admission and retention practices that are not based upon the medical necessity of the patients; (2) systematically understaffing UHS hospitals, providing abysmal training to the hospitals' staff, and ignoring the huge risks thereby imposed on the patients; and (3) causing UHS and UHS hospitals to be subject to government investigations and regulatory penalties arising from, at least, potential False Claims Act violations, Stark Law violations, and noncompliance with conditions required for participation in the Medicare/Medicaid program.

229.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

230.   In further breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Individual Defendants made and/or caused the Company to make false and misleading statements

Case ID: 170302824

and fail to disclose that, under their direction and on their watch: (1) UHS hospitals admitted and detained patients based on its own financial considerations and not upon the medical necessity of the patients; (2) UHS hospitals would keep patients admitted until their insurance payments ran out in order to ensure the maximum payment for its services; (3) UHS hospitals had maintained inadequate staffing levels, deficient staff training, and substandard patient care quality; (4) UHS's revenues from inpatient care largely relied on its unlawful and unsustainable admission/retention practices; and (5) UHS lacked effective internal controls over financial reporting. Moreover, the Individual Defendants failed to adequately correct those false and misleading statements and/or omissions of material fact.

231.    In further breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of millions of dollars worth of Company stock at artificially inflated prices while a majority of them engaged in lucrative insider sales.

## DAMAGES TO UHS

232.    As a direct and proximate result of the Individual Defendants' conduct, UHS will lose and expend many millions of dollars.

233.    Such expenditures include, but are not limited to, legal fees and payments made that are associated with the Securities Class Action filed against the Company and Defendants B. Miller and Filton, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by the public's loss of trust in the Company's business and services.

234.    Such losses include, but are not limited to, Company costs and fees and potential liability associated with the government subpoenas and investigations.

Case ID: 170302824

235. Such losses include, but are not limited to those arising from regulatory penalties, including the suspension of Medicare and Medicaid payments.

236. Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

237. Such losses include, but are not limited to, more than $34 million that Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

238. As a direct and proximate result of the Individual Defendants' conduct, UHS has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

239. Plaintiff brings this action derivatively and for the benefit of UHS to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of UHS and unjust enrichment, as well as the aiding and abetting thereof.

240. UHS is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

241. Plaintiff is, and has been since before the beginning of the Relevant Period, a UHS shareholder. Plaintiff will adequately and fairly represent the interests of UHS in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

- 73 -

Case ID: 170302824

## DEMAND FUTILITY ALLEGATIONS

242. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

243. A pre-suit demand on the Board of UHS is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants B. Miller, D. Miller, Pantaleoni, McDonnell, Hotz, Herrell, and Gibbs (collectively, the "Directors"). Plaintiff only needs to allege demand futility as to four of the seven Directors that are on the Board at the time this action is commenced.

244. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to pursue financial gain at the expense of patients' health and to make and/or cause the Company to make false and misleading statements and omissions of material fact while they caused the Company to repurchase its own stock at artificially inflated prices and while a majority of them engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

245. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, five of the Individual Defendants, including four Directors, collectively sold millions of dollars worth of Company stock at artificially inflated prices based on inside material information. As a result of the foregoing, the Directors breached

Case ID: 170302824

their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

246.    Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by more than $4 million for its own Class B common stock during the Relevant Period.  The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

247.    Furthermore, demand is excused as to all of the Directors because 80% of the directors were elected by Defendant B. Miller and Defendant D. Miller, and are thus beholden to them. As disclosed by the Company, Defendant B. Miller and D. Miller held "more than 95% of the shares of Class A and Class C Common Stock, who were entitled to elect 80% of the entire Board of Directors and constitutes more than 50% of our aggregate voting power." The Company also acknowledged that such a "concentrated control" over the Company might result in "conflicts of interest in overseeing the management of the Company." As such, a majority of Board is not independent or disinterested, and demand upon the Board is futile, and thus excused.

248.    Additional reasons that demand on Defendant B. Miller is futile follow.  Defendant B. Miller has been the Company's Chairman of the Board and CEO since 1978.  As the Company admits, he is thus a non-independent director. Indeed, Defendant B. Miller received tens of millions of dollars in compensation from the Company. For example, Defendant B. Miller received total compensation of $20,477,031 for 2015. His large Class B stock holding, worth over $988

- 75 -

million, reveals his interest in keeping the Company's stock price as high as possible. Defendant B. Miller was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed and was ultimately responsible for the Company's engagement in the Willful or Reckless Mismanagement of the Hospitals. Moreover, Defendant B. Miller is a defendant in the Securities Class Action. As a shareholder who obtained controlling voting power to elect 80% of the Directors, the Chairman of the Board, and a member of the Executive Committee and the Finance Committee, Defendant B. Miller conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact and the scheme to engage in the Willful or Reckless Mismanagement of the Hospitals, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant B. Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

249.    Additional reasons that demand on Defendant D. Miller is futile follow.  Defendant D. Miller has been a Company's director since 2006 and was appointed President of the Company in May 2009. As the Company admits, he is a non-independent director. Indeed, Defendant D. Miller received millions of dollars in compensation from the Company. For example, Defendant D. Miller received total compensation of $3,659,338 for 2015. His large Class B stock holding, worth over $298 million, reveals his interest in keeping the Company's stock price as high as possible. Defendant D. Miller is the son of Defendant B. Miller, together with whom he controls

- 76 -

over 95% of the Company's Class A and Class C common stock, representing over 50% of the Company's aggregate voting power and the privilege to elect 80% of the entire Board of Directors. Obviously, Defendant D. Miller is not disinterested and cannot fairly consider a demand to initiate actions against himself and his father, Defendant B. Miller. Moreover, as a Company director and a member of the Executive Committee and the Finance Committee, Defendant D. Miller conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact (he signed the 2015 10-K) and the scheme to engage in the Willful or Reckless Mismanagement of the Hospitals, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant D. Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.   Additional reasons that demand on Defendant Pantaleoni is futile follow. Defendant Pantaleoni has been a Company's director since 1982. The Company admits that Defendant Pantaleoni is not an independent director. Defendant Pantaleoni is Of Counsel to Norton Rose Fulbright US LLP, the law firm UHS uses as outside corporate counsel. This law firm also provides personal legal services to Defendant B. Miller. Moreover, as disclosed by the Company, Defendant Pantaleoni is also the trustee of certain trusts for the benefit of Defendant B. Miller and his family. Therefore, Defendant Pantaleoni is beholden to and depends on Defendant B. Miller and Defendant D. Miller for his financial well-being. Additionally, Defendant Pantaleoni's large Class B stock holding, worth approximately $98 million, reveals his interest in keeping the

- 77 -

Case ID: 170302824

Company's stock price as high as possible. His insider sales before the fraud was exposed demonstrate his motive in facilitating and participating in the fraud. As a Company director and a member of the Executive Committee and the Finance Committee, Defendant Pantaleoni conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact (he signed the 2015 10-K) and the scheme to engage in the Willful or Reckless Mismanagement of the Hospitals, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Pantaleoni breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251.    Additional reasons that demand on Defendant McDonnell is futile follow. Defendant McDonnell has been a Company director since April 2013. Defendant McDonnell was elected to the Board by Class A and Class C stockholders, in other words, by Defendant B. Miller and D. Miller. Defendant McDonnell currently serves as Chairman and CEO of The Penn Mutual Life Insurance Company ("Penn Mutual"). According to her biography posted on Penn Mutual's website, she was appointed CEO of Penn Mutual in 2011 and president in 2010, after serving as chief marketing officer since 2008. Defendant B. Miller was formerly a Director of Penn Mutual Life Insurance Company from 1994 until February 2013. Thus, Defendant McDonnell was beholden to Defendant B. Miller for her career success and financial well-being. She was also beholden to and controlled by Defendant B. Miller and Defendant D. Miller, who together controlled the Board and the Company. Moreover, Defendant McDonnell is a member of the Audit

Case ID: 170302824

Committee, which renders her especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings and for the failure to maintain effective disclosure controls and internal control over financial reporting. As a director and member of the Audit Committee, Defendant McDonnell conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact (she signed the 2015 10-K) and the scheme to engage in the Willful or Reckless Mismanagement of the Hospitals, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant McDonnell also maintains a large Class B common stock holding, worth approximately $1.15 million, revealing her interest in keeping the Company's stock price as high as possible. Thus, for these reasons, too, Defendant McDonnell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

252.   Additional reasons that demand on Defendant Hotz is futile follow. Defendant Hotz is the Chair of the Compensation Committee and the Nominating & Corporate Governance Committee. As such, he is especially culpable for the Board's failure to properly evaluate the Directors and the CEO. His large Company Class B stock holding, worth over $6.4 million while the price of the Company's stock was artificially inflated, reveals his interest in keeping the Company's stock price as high as possible. His insider sales before the fraud was exposed further demonstrate his motive in facilitating and participating in the fraud. As a director, Chair of the Compensation Committee and the Nominating & Corporate Governance Committee, and a

- 79 -

Case ID: 170302824

member of the Audit Committee, the Executive Committee and the Finance Committee, Defendant Hotz conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact (he signed the 2015 10-K) and the scheme to engage in the Willful or Reckless Mismanagement of the Hospitals, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  He was beholden to and controlled by Defendant B. Miller and Defendant D. Miller, who together controlled the Board and the Company.  Thus, for these reasons, too, Defendant Hotz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

253.    Additional reasons that demand on Defendant Herrell is futile follow.  Defendant Herrell is the Chair of the Audit Committee. As such, he is especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings and for the failure to maintain effective disclosure controls and internal control over financial reporting.  His large Company Class B stock holding, worth approximately $3.5 million while the price of the Company's stock was artificially inflated, reveals his interest in keeping the Company's stock price as high as possible. His insider sales before the fraud was exposed further demonstrate his motive in facilitating and participating in the fraud. As a director, Chair of the Audit Committee and a member of the Compensation Committee and the Nominating & Corporate Governance Committee, Defendant Herrell conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement

- 80 -

Case ID: 170302824

in the scheme to make false and misleading statements and omissions of material fact (he signed the 2015 10-K) and the scheme to engage in the Willful or Reckless Mismanagement of the Hospitals, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. He was beholden to and controlled by Defendant B. Miller and Defendant D. Miller, who together controlled the Board and the Company. Thus, for these reasons, too, Defendant Herrell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

254.    Additional reasons that demand on Defendant Gibbs is futile follow. Defendant Gibbs has been a Company director since 2011. His large Company Class B stock holding, worth approximately $892,301 while the price of the Company's stock was artificially inflated, reveals his interest in keeping the Company's stock price as high as possible. His insider sales before the fraud was exposed further demonstrate his motive in facilitating and participating in the fraud. As a director and a member of the Audit Committee, the Compensation Committee and the Nominating & Corporate Governance Committee, Defendant Gibbs conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact (he signed the 2015 10-K) and the scheme to engage in the Willful or Reckless Mismanagement of the Hospitals, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. He was beholden to and controlled by Defendant B. Miller and Defendant D. Miller, who together controlled the Board and the Company. Thus, for these reasons, too,

- 81 -

Defendant Gibbs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

255.   Additional reasons that demand on the Board is futile follow.

256.   The Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The Directors did not comply with the requirements of the Code of Ethics. The Directors violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein while they caused the Company to repurchase its own stock at artificially inflated prices and while a majority of the Directors engaged in lucrative insider sales.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

257.   Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant B. Miller, who is the Company's top officer and Chairman of the Board, and Defendant D. Miller, who together controls the voting power to elect five of the seven Directors on the Board, and who made and were most responsible for causing the Company's misconduct and for making and causing the Company to make the false and misleading statements of material fact alleged herein and for failing to correct and to cause the Company to correct those false and misleading statements.

- 82 -

Case ID: 170302824

258.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile.

259.    UHS has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed ***any*** lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for UHS any part of the damages UHS suffered, and will continue to suffer, thereby.  Thus, any demand on the Directors would be futile.

260.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

261.    The acts complained of herein constitute violations of fiduciary duties owed by UHS's officers and directors, and these acts are incapable of ratification.

262.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

Case ID: 170302824

insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of UHS.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of UHS, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

263.    If there is no directors' and officers' liability insurance, then the Directors will not cause UHS to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

264.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UHS's business and affairs.

- 84 -

Case ID: 170302824

267.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

268.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of UHS.

269.    In breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly mismanaged the Company and its hospitals by 1) causing UHS hospitals to adopt financially driven admission and retention practices that are not based upon the medical necessity of the patients; 2) systematically understaffing UHS hospitals, providing abysmal training to the hospitals' staff, and ignoring the huge risks thereby imposed on the patients; and 3) causing UHS and UHS hospitals to be subject to government investigations and regulatory penalties arising from, at least, potential False Claims Act violations, Stark Law violations, and noncompliance with conditions required for participation in the Medicare/Medicaid program.

270.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

271.    In further breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Individual Defendants made and/or caused the Company to make false and misleading statements

- 85 -

and fail to disclose that, under their direction and on their watch: (1) UHS hospitals admitted and detained patients based on its own financial considerations and not upon the medical necessity of the patients; (2) UHS hospitals would keep patients admitted until their insurance payments ran out in order to ensure the maximum payment for its services; (3) UHS hospitals had maintained inadequate staffing levels, deficient staff training, and substandard patient care quality; (4) UHS's revenues from inpatient care largely relied on its unlawful and unsustainable admission/retention practices; and (5) UHS lacked effective internal controls over financial reporting. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein. A majority of the Individual Defendants even engaged in lucrative insider sales while the price of the Company common stock was artificially inflated due to the false and misleading statements of material fact.

272.    In further breach of their fiduciary duties owed to UHS, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of millions of dollars worth of Company stock at artificially inflated prices while a majority of them made lucrative insider sales.

273.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements and representations.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of UHS's securities and disguising insider sales.

- 86 -

Case ID: 170302824

274.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of benefitting Company insiders, artificially inflating the price of UHS's securities, and disguising insider sales.

275.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

276.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UHS has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

277.     Plaintiff on behalf of UHS has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

278.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

279.     By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused the Company to make, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, UHS.

Case ID: 170302824

280.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from UHS that was tied to the performance or artificially inflated valuation of UHS, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

281.    Plaintiff, as a shareholder and a representative of UHS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from over-compensation, insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

282.    Plaintiff on behalf of UHS have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence UHS, for which they are legally responsible.

285.    As a direct and proximate result of the Individual Defendants' abuse of control, UHS has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, UHS has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

286.    Plaintiff on behalf of UHS has no adequate remedy at law.

Case ID: 170302824

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

287.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

288.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of UHS in a manner consistent with the operations of a publicly-held corporation.

289.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, UHS has sustained and will continue to sustain significant damages.

290.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

291.    Plaintiff, on behalf of UHS, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

292.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

293.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused UHS to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions and investigations, and to lose business from customers who no longer trust the Company and its hospital services.

- 89 -

Case ID: 170302824

294.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

295.    Plaintiff on behalf of UHS has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of UHS, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to UHS;

(c)     Determining and awarding to UHS the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing UHS and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UHS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of UHS (other than the B. Miller

- 90 -

Case ID: 170302824

and implement procedures for greater shareholder input into the policies and guidelines of the board;

    2.  a provision to permit the shareholders of UHS (other than the B. Miller and his family, and any of their affiliates) to nominate at least four candidates for election to the board; and

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding UHS restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: March 24, 2017          Respectfully submitted,

                    **THE ROSEN LAW FIRM, P.A.**

                    BY:

                        Jacob A. Goldberg (PA ID: 66399)
                        Gonen Haklay (PA ID: 764446)
                        101 Greenwood Avenue, Suite 203
                        Jenkintown, PA 19046
                        Tel: (215) 600-2817
                        Fax: (212) 202-3827
                        jgoldberg@rosenlegal.com
                        ghaklay@rosenlegal.com

Case ID: 170302824

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Case ID: 170302824

VERIFICATION

I, David Heed, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _14_ day of March, 2017.

David Heed